**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 06-1481**

———————————

RAMSEY REED,

Plaintiff - Appellant,

versus

BUCKEYE FIRE EQUIPMENT; BRYAN BOWER,

Defendants - Appellees.

———————————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Richard L. Voorhees, Chief District Judge. (3:02-cv-00205)

———————————

Argued: May 23, 2007                    Decided: July 30, 2007

———————————

Before KING and DUNCAN, Circuit Judges, and WILKINS, Senior Circuit Judge.

———————————

Affirmed in part; reversed and remanded in part by unpublished per curiam opinion.

———————————

**ARGUED:** Stephen Luke Largess, FERGUSON, STEIN, CHAMBERS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina, for Appellant. George Bryan Adams, III, VAN HOY, REUTLINGER, ADAMS & DUNN, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Philip M. Van Hoy, VAN HOY, REUTLINGER, ADAMS & DUNN, Charlotte, North Carolina, for Appellees.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ramsey Reed ("Appellant") appeals the district court's grant of summary judgment in favor of Buckeye Fire Equipment Company ("Buckeye") and Bryan Bower (collectively, "Appellees") on various claims related to the termination of his employment on April 30, 2001. He alleges that, in firing him while he was on medical leave, Buckeye violated the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601, et seq. and North Carolina's prohibition against age discrimination in employment, N.C. Gen. Stat. § 143-422.2. He also alleges that Bryan Bower obstructed justice and engaged in a civil conspiracy by attempting to blackmail him into not filing this lawsuit.

The district court discerned no material issue of fact in any of Appellant's claims and granted summary judgment in favor of Appellees on both the FMLA and state-law claims. Our review of the record reveals, however, that Appellant has presented triable issues in the claims against Buckeye and the obstruction of justice claim against Bryan Bower. Accordingly, we reverse the district court's order on the FMLA, age discrimination and obstruction of justice claims, and affirm on the civil-conspiracy claim. We set forth the pertinent facts below, reciting them in the light most favorable to Appellant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

2

I.

Buckeye is a family-owned business headquartered in Kings Mountain, North Carolina that manufactures and sells firefighting equipment. Tom Bower and his two sons, Kevin and Bryan, own and operate the company.

On January 25, 2001, Appellant was involved in a serious car accident that necessitated medical leave. He suffered a severe compound fracture to his leg that punctured his skin in several places and required immediate surgery. Appellant was hospitalized for several days following the surgery and underwent rehabilitative therapy thereafter.

On the day of the accident, Appellant's wife called Kevin Bower, Buckeye's Vice President of Operations, to inform him of her husband's accident and injury. Once Appellant was discharged from the hospital, he also spoke with Kevin Bower and informed him that he would require at least two months' leave from work to recover.[1]

---

[1]Buckeye advances a different account of its contact with Appellant following his accident. According to Buckeye, Kevin Bower spoke with Appellant on January 26, the day following his accident, and followed up with a letter the same day. In the letter, Kevin Bower informed Appellant that his leave fell under the FMLA and he had up to twelve weeks to return to work "per our discussion this morning." J.A. 417. During discovery, Buckeye produced an unsigned copy of this letter that bore a facsimile stamp indicating that it had been sent from Tom Bower's home office on April 29, 2002, seven days after Appellant filed this suit.

Appellant contends that he did not talk with Kevin Bower on January 26 and indeed could not have because of the painkillers he was taking. He further asserts that he never received the letter provided during discovery and that Buckeye forged it after the fact to improve its legal position in this lawsuit. For purposes of

Appellant updated Kevin Bower from time to time regarding his medical progress, which was steady until late-February.

On February 15, 2001, Buckeye's maintenance manager, Howard Corbin ("Corbin"), called Appellant to seek his help with several equipment problems that had arisen during his absence. Appellant's doctor cleared him to return to work on a limited basis in a wheelchair, and Appellant returned to Buckeye on February 23. He fixed a problem with an automated label machine and taught the maintenance crew how to resolve it in his absence. For a variety of reasons, however, Appellant had to delay fixing a separate problem with a gauge assembly machine until the following week.

Over the intervening weekend, Appellant was hospitalized for treatment of a serious blood clot in his leg. He remained in the hospital for two days and was placed on blood-thinning medication before being discharged with an order to remain homebound for six weeks. Appellant spoke with Buckeye's comptroller about this setback, but was unsuccessful in several attempts to reach Kevin Bower about the same.

Following treatment for the blood clot, Appellant's recovery continued at a steady pace. By the end of March 2001, he was using a walker, was cleared by his doctors to leave his house, and was receiving outpatient physical therapy. By mid-April, he was

reviewing the motion for summary judgment, we assume, as did the district court, that Appellant did not receive the letter in question.

walking with a cane and had purchased a new truck in preparation for his return to work. On April 17, Appellant told Corbin that he would return to Buckeye full-time on May 7. However, Tom Bower called Appellant on April 30 to tell him that Buckeye was terminating his employment for performance-related reasons. By that time, Appellant had been on medical leave for nearly thirteen-and-a-half weeks.

### A. Contested Workplace Issues

The parties dispute virtually every material fact underlying Appellant's termination. To substantiate its claim of inadequate job performance, Buckeye points to a number of equipment problems arising both during and after Appellant's tenure, a change in Appellant's job title in 1996, and a series of personal conduct issues. Appellant disputes the significance of the equipment problems, contests Buckeye's characterization of the change in job title, and challenges the claims of unprofessional conduct. We now briefly summarize each episode in contention and the nature of the dispute.

### 1. The Weld Line

In 1997, Buckeye contracted with a local manufacturer, Sotec, to develop a weld line to automate the production of its fire extinguisher cylinders. Tom Bower wanted the automated line to produce two hundred forty welded cylinders per hour and pay for itself within three years. Sotec agreed to Buckeye's design

5

specifications and promised to deliver the weld line within twenty to twenty-two weeks.

Appellant, as Buckeye's head engineer, spent significant time at Sotec's plant working closely with its personnel during the production and testing phase of the line. The project experienced technical problems and the line remained nonfunctional after eighteen months, far beyond the contractual time frame. Buckeye contends that Appellant failed to keep it fully informed of these problems. Kevin Bower eventually grew so frustrated with Sotec that he ordered the line moved to Buckeye's facilities for completion. It became apparent that even then the weld line could not meet the expectations of Buckeye's management.

Buckeye contends that Appellant was principally responsible for this project and that its problematic history, along with his lack of communication regarding the problems during the line's construction, is evidence of his poor job performance. Appellant argues that the problems with the weld line lay in its construction, which was Sotec's responsibility, and not in the design that he developed. He additionally contends that he kept Buckeye fully apprised of the project's status and that he was not principally responsible for the weld line.

2.   Gauge Assembly Machine

Sometime in either 1996 or 1999 (Appellant claims the former and Buckeye the latter), Buckeye purchased a machine to automate

the gauge assembly for its fire extinguishers. The machine never functioned properly because of design flaws attributable to the original manufacturer. As a result, Buckeye required the manufacturer to redesign and rebuild parts of the machine. The machine's laser sensors proved particularly troublesome, requiring constant manual adjustment. When Appellant was on medical leave, the gauge assembly machine began malfunctioning, with expensive consequences.

Buckeye contends that these events reflect poorly on Appellant's performance because he selected the laser sensors and was responsible for the project. Appellant contends that he played no role in the machine's poor design and was able to circumvent it with manual adjustments that kept the machine running for more than five years. He further attributes the need for costly repairs to the damage caused by maintenance workers' maladroit attempts to perform manual adjustments in his absence.

### 3. Automated Labeling Machine

In 1997, Buckeye purchased an automation line that was designed to fill fire extinguishers with a dry chemical. Appellant convinced Tom Bower to add a $65,000 component to the line that automatically applied labels to the fire extinguishers. Buckeye claims that this machine never worked properly and that it was on the verge of purchasing a new labeling machine for $20,000 at the time the parties were conducting discovery in this lawsuit.

7

Appellant counters that the machine worked perfectly for a year or more and only ran into problems when Buckeye switched to a cheaper label that was not compatible with the machine.

### 4. Box Assembly Machine

In 2000, Buckeye installed a machine in its automated cylinder fill line to assemble boxes in which to ship fire extinguishers. However, the boxes did not stay closed properly, resulting in extinguishers falling out and generating customer complaints. Buckeye claims that Appellant had primary responsibility for installing the machine and ensuring that it was operational, and that it did not work properly until several years after Appellant's termination. Appellant responds that the problem involved the use of a glue that did not dry quickly enough in warm weather and was corrected before he was fired by using a different type of glue.

### 5. Change in Appellant's Job Title

Buckeye hired Appellant in 1994 as General Manager. The parties dispute, however, whether Appellant ever exercised authority commensurate with the title. Buckeye asserts that Appellant supervised both manufacturing and engineering operations of the company and had eighty-five employees reporting to him. Appellant argues that he was relegated to a subordinate role devoid of the autonomous power or managerial responsibility that Buckeye now claims.

In any event, the parties agree that Buckeye changed Appellant's job title to Head of Engineering in 1996 in the reshuffling that followed the retirement of Buckeye's chief engineer and president. In this capacity, Appellant was to supervise "product development, engineering changes of existing products and all installation of new machinery to automate manufacturing operations." J.A. 431. Buckeye characterizes the change as a demotion; rather than exercising responsibility for all plant management, Appellant was limited to supervising plant operations involving automation, and his direct reports were reduced from eighty-five to one. Appellant maintains that the adjustment simply realigned his title with his actual responsibilities.

Although Appellant initially resisted the change in positions, he eventually acceded to it. Buckeye gave him a $2,000 salary increase and issued a positively-worded announcement to all of the company's employees. Buckeye claims that the salary increase was an inducement for Appellant to stay with the company and the announcement was intended to spare him embarrassment.

6. Appellant's Personal Habits

Buckeye contends that Appellant's personal habits and professional demeanor caused problems in the workplace. Specifically, it claims that: (1) Appellant violated its policy on smoking breaks by frequently leaving the plant floor, in full view

of other employees, to smoke; (2) it received complaints that Appellant left work early, arrived late, and was often visibly hungover; and (3) Appellant bragged about his gambling exploits and waived wads of cash around in front of hourly employees who earned less then he. Buckeye claims that it warned Appellant about this behavior on numerous occasions. Although there was no record of any warnings in Appellant's file, Buckeye states that it was company policy not to reprimand managers in writing. Appellant disputes the allegations. He claims to have stopped smoking before the alleged smoke breaks, that he never received negative feedback from his supervisors, and that his behavior did not differ in any significant respect from that of others at the plant.

## B. Bryan Bower's Alleged Threat

After Appellant's termination, he sent a demand letter to Tom Bower seeking monetary damages and reinstatement in settlement of his claims. He further offered to forego reinstatement if Buckeye paid him roughly two years' salary and provided a good letter of reference. Tom Bower turned the letter over to Bryan Bower, who handled most of Buckeye's legal matters. Before responding, Bryan searched through Appellant's personal effects at the plant and discovered romantic correspondence sent to Appellant by a woman to whom he was not married. Bryan brought this note to his father's attention.

10

A subsequent phone call between Appellant and Bryan Bower is another source of significant dispute. Appellant alleges that Bryan, acting at his father's behest, tried to blackmail him by threatening to reveal the correspondence to Appellant's wife if he proceeded with this lawsuit. Bryan claims that he called Appellant to attempt to resolve this dispute amicably, and neither made threats nor discussed doing so with anyone. He acknowledges mentioning the letter to Appellant, but only to ask Appellant to have his girlfriend stop sending correspondence to Buckeye.

## C. Trial Court Proceedings

Appellant filed suit alleging that Buckeye violated the FMLA by terminating him while he was on medical leave, and engaged in unlawful age discrimination by transferring his job responsibilities to younger workers after firing him. Appellant further alleged that Bryan Bower engaged in civil conspiracy and obstruction of justice by attempting, at Tom Bower's behest, to blackmail him into foregoing suit. Appellees moved for summary judgment on all claims, which the district court granted. See Reed v. Buckeye Fire Equip. Co., 422 F. Supp. 2d 570, 572 (W.D.N.C. 2006). Appellant timely appealed.

## II.

We review de novo an appeal from a grant of summary judgment and apply the same standard as the district court. Howard v.

<u>Winter</u>, 446 F.3d 559, 565 (4th Cir. 2006).  Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Liberty Lobby</u>, 477 U.S. at 248.  We must construe the facts in a light most favorable to Appellant as the nonmoving party.  <u>See</u> <u>id.</u> at 255.  Guided by these principles, we turn to a consideration of Appellant's arguments.

A.

First, Appellant challenges the district court's grant of summary judgment on his FMLA claim.  He alleges that Buckeye violated the FMLA by failing to provide him with the required notice of his rights thereunder.  He contends that such failure is actionable because it both interfered with and caused prejudice to his FMLA rights by depriving him of the knowledge that, in order to avoid losing his job, he needed to return to work within the twelve weeks of protected leave.  He claims that if he had received the required notice, he could have structured his medical care to return within this time frame and consequently would not have been fired by Buckeye.  Buckeye counters that it provided the required

12

notice and regardless terminated Appellant for reasons unrelated to his medical leave.

In its summary judgment analysis, the district court presumed that Buckeye failed to send Appellant the required notice, thereby interfering with his FMLA rights. However, the district court granted Buckeye's motion for summary judgment after concluding that any such lack of notice did not prejudice Appellant's right to return to his job because Buckeye fired him for reasons independent of his medical leave. We must disagree. We are constrained on this record to find sufficient factual disputes to preclude summary judgment.

Congress passed the FMLA to provide workers flexibility in managing their work and family responsibilities by guaranteeing reasonable medical leave in certain circumstances. See 29 U.S.C. § 2601(b). An "eligible employee" has the right to take up to twelve weeks' leave from work during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of" his or her job.[2] 29 U.S.C. § 2612(a)(1)(D). The employee has an accompanying right to return to the same or an equivalent position at the conclusion of the leave

---

[2]It is uncontested that Appellant qualifies as an "eligible employee," see 29 U.S.C. § 2611(2) (definition of "eligible employee"), and that his injuries constituted a "serious health condition" that impeded his ability to perform his job, see 29 U.S.C. § 2611(11) (definition of "serious health condition").

period.[3]  29 U.S.C. § 2614(a)(1).

The right to reinstatement following FMLA leave is not unqualified.  29 U.S.C. § 2614(a)(3)(B); See Also Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 547 (4th Cir. 2006). "An employee has no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period."  29 C.F.R. § 825.216(a).  In other words, the mere fact that an employee takes leave under FMLA offers no protection from decisions adversely affecting employment status.

The FMLA requires an employer to provide an employee requesting leave notice of his or her rights within a reasonable time, "one or two business days [after the request] if feasible." 29 C.F.R. § 825.301(c).  If the employer learns of the employee's need after the leave has commenced, "notice should be mailed to the employee's address of record."  Id.  Such notice should include, as appropriate, indication "that the leave will be counted against the employee's annual" twelve weeks of leave protected by the FMLA, 29 C.F.R. § 825.301(b)(1)(I), and that the employee has the "right to restoration to the same or an equivalent job upon return" to work, 29 C.F.R. § 825.301(b)(1)(vii).

An employer who prevents or impedes an employee from exercising his or her FMLA rights is liable to the employee for, as

---

[3]There are narrow exceptions to this reinstatement requirement that are not applicable here.  See § 2614(b).

14

appropriate, damages and equitable relief.  29 U.S.C. §§ 2615(a), 2617(a).  To state such a claim, the employee must prove that the employer: (1) interfered with his or her exercise of FMLA rights; and (2) caused prejudice thereby.  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002).  Actionable interference exists where the employer impedes, restrains, or denies the exercise of any rights protected the FMLA.  29 C.F.R. § 825.220(a).  Prejudice exists where an employee loses compensation or benefits "by reason of the violation," 29 U.S.C. § 2617(a)(1)(A)(i)(I); sustains other monetary losses "as a direct result of the violation," § 2617(a)(1)(A)(i)(II); or suffers some loss in employment status remediable through "appropriate" equitable relief, § 2617(a)(1)(B).  We consider each of these elements in turn.

With respect to the interference prong, the district court assumed that Buckeye interfered with Appellant's FMLA rights by failing to provide the required notice.  Buckeye contends that it satisfied its notice obligations by mailing a letter to Appellant on January 26, 2001 that apprised him of his FMLA rights and the twelve-week limit on his medical leave.  Appellant responds that Buckeye neither sent this letter nor otherwise provided notice of his rights.  The evidence in the record is both ambiguous and disputed.  Viewed in the light most favorable to Appellant, we must

presume that Buckeye did not send the letter[4] and therefore failed to satisfy 29 C.F.R. § 825.301(c).[5] Such failure constitutes actionable interference. <u>See</u> 29 C.F.R. § 825.220(b) ("Any violations of the [FMLA] or of [its governing] regulations constitute interfering with . . . the exercise of rights provided by the [FMLA].").

---

[4]We decline to address Appellant's request to sanction Buckeye for allegedly falsifying the January 26 letter. Before the district court, Appellant raised the specter of manufactured evidence, but he did not formally request the sanctions that he now seeks. The district court sharply rebuked Appellant for his allegations of impropriety, but did not have occasion to address them in the context of a formal request for sanctions. Although the district court's opinion leaves no doubt of its view of Appellant's allegations, it would be inappropriate for us to address this issue in the first instance. <u>See</u> <u>Muth v. United States</u>, 1 F.3d 246, 250 (4th Cir. 1993) (court generally declines to hear issues raised for the first time on appeal absent plain error or fundamental miscarriage of justice).

[5]We find no merit in Buckeye's assertion that its duty to provide notice was either satisfied or obviated by Appellant's independent awareness of and access to information about the FMLA. The regulations governing the FMLA clearly indicate that an employer must provide the notice set forth in 29 C.F.R. § 825.301(b) when it learns of an employee's need to take leave. <u>See</u> 29 C.F.R. § 825.301(c). This requirement is worded as an imperative--"notice shall be given"--that does not take account of what the employee may know or have access to or any notice previously supplied by the employer. <u>See</u> <u>id.</u> Therefore, what Appellant may have known or had access to is immaterial to the question of whether Buckeye satisfied its obligation to provide notice under § 825.301(c).

Further, the circumstances of this case demonstrate the utility of this notice requirement. Despite the fact that Appellant was aware of the FMLA, knew that Buckeye had a FMLA policy, and had access to various information about FMLA's protections, he <u>did not</u> know that FMLA applied either to his job position in general or specifically to the medical leave at issue here. The notice required by § 825.301(c) would have disabused him of both misconceptions.

16

We therefore consider whether Appellant has adduced sufficient evidence to survive summary judgment that such interference prejudiced him. Buckeye contends that Appellant was a substandard employee whom it had considered firing long before his FMLA leave and whom it ultimately fired for poor job performance. Appellant argues that there are numerous disputes about the underlying facts, and that the district court erred by resolving those disputes in Buckeye's favor. Viewing the evidence in a light most favorable to Appellant, we must agree.

To substantiate its claims of poor job performance, Buckeye points to a series of operational problems with projects on which Appellant worked, certain of his personal habits, and aspects of his employment history. Appellant, however, has responded with evidence that calls each incident into legitimate dispute. For example, Buckeye argues that Appellant was responsible for the problematic development and implementation of the weld line because of his close involvement in its design and construction. However, other evidence suggests that the problems with the line stemmed from the manufacturer's decision to use inadequate construction materials. Viewing these facts in Appellant's favor, we cannot conclude as a matter of law that this incident is demonstrative of his alleged poor job performance.

Similar factual disputes exist for each of the other incidents at issue. With respect to the gauge assembly machine, Buckeye

17

argues that Appellant equipped the machine with a poorly functioning laser sensor that required constant manual adjustment and eventual replacement at a significant cost. Other evidence suggests that, until he went on medical leave, Appellant was able to keep the machine running despite problems caused by the original manufacturer's poor design. With respect to the box assembly machine, Buckeye contends that Appellant selected a faulty machine that could not assemble boxes properly. Other evidence suggests that the problem with the machine was easily resolved when a new type of glue was used to seal the assembled boxes. With respect to the label machine, Buckeye contends that Appellant selected a faulty machine that could not properly apply labels. Other evidence suggests that the machine functioned properly until Buckeye switched to a less expensive label that was not fully compatible with the machine.

Buckeye's contentions regarding Appellant's personal habits and employment history remain in similar dispute. Buckeye asserts that Appellant took excessive smoking breaks, but other evidence suggests that he had quit smoking before these alleged incidents. Buckeye asserts that it repeatedly warned Appellant about inappropriate behavior around the other employees, but there is no documentary evidence to substantiate this assertion, which Appellant disputes. Buckeye asserts that it demoted Appellant from General Manager to Head of Engineering in 1996, but other evidence

18

suggests that Appellant's job duties were relatively consistent throughout his employment.

Ultimately, Buckeye has not adduced sufficient undisputed facts to demonstrate that it fired Appellant solely for reasons of job performance. We cannot conclude, at this stage of the proceedings, that Buckeye's failure to provide notice did not prejudice Appellant's right to reinstatement under the FMLA. Because Buckeye has not demonstrated an absence of a material issue of fact regarding either element of Appellant's FMLA claim, summary judgment is inappropriate.

B.

Next, Appellant challenges the district court's grant of summary judgment on his claim for age discrimination. The public policy of North Carolina, as stated in N.C. Gen. Stat. § 143-422.2, prohibits employers from discriminating against their employees on the basis of age. In implementing this policy, North Carolina courts follow the evidentiary standards and principles of law applied to federal discrimination claims. N.C. Dept. of Correction v. Gibson, 301 S.E.2d 78, 85 (N.C. 1983). The federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., governs claims of age-based discrimination.

Because Appellant does not put forth any direct or circumstantial evidence of discrimination, we analyze his claim under the burden-shifting framework set forth in McDonnell Douglas

19

Corp. v. Green, 411 U.S. 792 (1973). See Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006). Under this framework, Appellant has the initial burden of proving a prima facie case of discrimination. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). For purposes of the ADEA, Appellant must show that: (1) he was in the protected age group (i.e., over the age of forty); (2) he was discharged; (3) his job performance met the legitimate expectations of his employer at the time he was fired; and (4) he was replaced by an individual that was substantially younger. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

If Appellant is able to establish each of these elements, the burden then shifts to Buckeye "to articulate a legitimate, nondiscriminatory reason for the adverse employment action," Hill, 354 F.3d at 285. If Buckeye carries this burden, Appellant must then show that the "proffered permissible reason . . . is actually a pretext for discrimination," id. Specifically, Appellant must "prove by a preponderance of the evidence that the legitimate reasons offered by [Buckeye] were not its true reasons, but were a pretext for discrimination." Reeves, 530 U.S. at 143 (internal quotations omitted).

We turn first to Appellant's prima facie case of discrimination. He easily satisfies the first two elements because it is undisputed (1) that he was over the age of forty when he lost

his job and (2) that Buckeye fired him.  Viewing the facts in the light most favorable to him, as we must at this juncture, we believe that Appellant satisfies the third and fourth elements as well.

With respect to the third element, for summary judgment purposes there is sufficient evidence to establish that Appellant was meeting Buckeye's legitimate expectations when he was terminated.  Buckeye continuously employed Appellant at a high level of its organization for nearly seven years, and granted him several raises and bonuses during that time.  Buckeye gave him significant responsibility for designing, procuring, supervising, troubleshooting, and repairing critical components of the manufacturing infrastructure for its most important products.  There is no documentation of any of the alleged problems with Appellant's performance or work habits.  Therefore, we find that there is at least a triable issue of fact in this regard.

We likewise conclude that Appellant has adduced sufficient evidence to establish that Buckeye transferred his job duties to younger workers.  Appellant, who was 55-years-old when fired by Buckeye, contends that Buckeye transferred some of his job duties to John Classic, a 45-year-old[6] employee, and outsourced other of

---

[6]The fact that Classic is also in the class protected by the ADEA is not material.  The Supreme Court has held that the ADEA does not require an employee in the protected class to lose his job to someone outside the protected class in order to state a claim. O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996).

his job duties before hiring Bill Besco, aged forty, to head engineering.  Buckeye responds that it eliminated Appellant's position, that John Classic's duties were materially distinct from Appellant's, and that it did not hire a new head of engineering until several years later.  There is evidence, however, to refute this characterization.  For example, Appellant presented evidence that, after he was fired, Classic assumed certain of Appellant's previous duties as liaison to a third-party testing laboratory.  In addition, it is undisputed that Buckeye eventually hired a 40-year-old as an engineer.  Construing these facts in Appellant's favor, we find sufficient evidence to satisfy the fourth element of his ADEA claim.

Because Appellant has established a prima facie case of age discrimination, we turn to Buckeye's proffered legitimate nondiscriminatory reason for his firing.  Buckeye's repeated assertion that it terminated Appellant for poor job performance, based on the same operational problems and personal habits underlying its defense of his FMLA claim, is insufficient for the reasons stated heretofore.  Regardless of the relative strength or weakness of Appellant's claims, there remain too many disputed issues of material fact to warrant an award of summary judgment.

---

Rather, the essential point is that the plaintiff "lost out because of his [or her] age."  Id. (emphasis omitted).

C.

Appellant next challenges the district court's grant of summary judgment in favor of Bryan Bower on the claims of civil conspiracy and obstruction of justice. Appellant based these claims on Bryan Bower's alleged threat, allegedly made at Tom Bower's behest, to reveal Appellant's affair to his wife if he filed this lawsuit. We consider the civil conspiracy and obstruction of justice causes of action separately.

1.

To state a claim for civil conspiracy under North Carolina law, a plaintiff must prove, inter alia, an agreement between two or more individuals to engage in an unlawful act or to accomplish a lawful act in an unlawful manner. Lenzer v. Flaherty, 418 S.E.2d 276, 284-85 (N.C. Ct. App. 1992). "[T]he evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." Dickens v. Puryear, 276 S.E.2d 325, 337 (N.C. 1981). The district court here concluded that Appellant's civil conspiracy failed because there was no evidence of an illicit agreement, and we agree.

Appellant has presented no evidence to create anything more than "a suspicion or conjecture" that Bryan Bower entered an illicit agreement to blackmail him into foregoing this lawsuit. Id. Appellant argues that we can infer such an agreement from the facts that (1) Bryan Bower made the alleged threat after Tom Bower

23

asked him to handle Appellant's demand letter, and (2) Bryan Bower brought the romantic correspondence to his father's attention before using it to attempt to blackmail Appellant. Such an inference, however, exceeds even the generous construction of the facts to which Appellant is entitled. There is no factual basis in the record to suggest that the Bowers ever discussed blackmailing Appellant, much less reached an agreement do so. Therefore, Appellant's conspiracy claim must fail.

2.

In North Carolina, it is a common-law civil offense "to do any act which prevents, obstructs, impedes or hinders public or legal justice." Broughton v. McClatchy Newspapers, Inc., 588 S.E.2d 20, 30 (N.C. Ct. App. 2003) (internal citations omitted). In Broughton, the North Carolina Court of Appeals affirmed summary judgment on an obstruction-of-justice claim because the "plaintiff presented no evidence that her case was in some way judicially prevented, obstructed, impeded or hindered by the acts of [the] defendants." Id. Here, the district court relied on Broughton in holding that Appellant's obstruction-of-justice claim failed because there was no evidence that Bryan Bower's alleged threat impeded or hindered this lawsuit. See Reed, 422 F. Supp. 2d at 588-89.

Despite the somewhat cursory conclusion in Broughton, however, there are other North Carolina decisions finding a legally

24

sufficient claim where the defendant <u>attempted</u> to prevent, obstruct, impede, or hinder justice. <u>See e.g.</u>, <u>Burgess v. Busby</u>, 544 S.E.2d 4, 12-13 (N.C. Ct. App. 2001) (upholding obstruction claim relating to medical malpractice case where the names of jurors were circulated by defendant to hospital staff <u>after</u> jury found for injured patient); <u>In re Kivett</u>, 309 S.E.2d 442, 462 (N.C. 1983) (finding judge removable for obstruction of justice where he unsuccessfully called on another judge to delay grand jury investigation); <u>see also</u> <u>Jackson v. Blue Dolphin Commc'ns of N.C.</u>, 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002) (upholding obstruction claim where defendant fired plaintiff-employee after she refused to give false testimony in an unrelated proceeding); <u>State v. Rogers</u>, 315 S.E.2d 492, 512-13 (N.C. Ct. App. 1984) (finding sufficient evidence to sustain a conviction of an attorney for attempting to interfere with a witness where the attorney engaged in overt acts designed to induce a witness to leave court so that the attorney could obtain a dismissal of the charges against his client).

We note, as well, that the North Carolina General Statutes setting forth specific crimes under the heading of <u>Obstructing Justice</u> also focus on the acts or attempted acts of the alleged obstructor, rather than the reaction of the victim. <u>See e.g.</u> N.C. Gen. Stat. § 14-226 ("If any person shall . . . intimidate or <u>attempt to intimidate</u> any person who is . . . a witness in any [state court], or prevent or deter, or <u>attempt to prevent or deter</u>

any person . . . acting as such witness from attendance upon such court, he shall be guilty of a Class H felony." (emphasis added)).

Based on our review of the precedent, we conclude that summary judgment was inappropriate here as well. Taking Appellant's allegation as true, Bryan Bower's action in threatening to reveal compromising correspondence to Appellant's wife if he proceeded with this lawsuit was so designed to impede his access to the legal system as to support a claim of obstruction of justice under North Carolina law.

## III.

Based on the foregoing, we reverse the district court's order granting summary judgment in favor of Appellees Buckeye Fire Equipment Company and Bryan Bower on Appellant Ramsey Reed's FMLA, age-discrimination, and obstruction of justice claims, and remand to the district court for further proceedings. We affirm the district court's grant of summary judgment in favor of Appellee Bryan Bower on Appellant's claim of civil conspiracy.

AFFIRMED IN PART;
REVERSED AND REMANDED IN PART