**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1943**

HANNAH P.,

          Plaintiff - Appellant,

      v.

DANIEL COATS, Director of the Office of The Director of National Intelligence
McLean, VA,

          Defendant - Appellee,

     and

MARK EWING, in his personal capacity McLean, VA,

          Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at
Alexandria.  Claude M. Hilton, Senior District Judge.  (1:16-cv-01030-CMH-IDD)

Argued:  October 31, 2018                    Decided:  February 19, 2019

Before GREGORY, Chief Judge, THACKER and QUATTLEBAUM, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.  Judge Thacker
wrote the opinion, in which Judge Quattlebaum joined.  Chief Judge Gregory wrote a
separate opinion concurring in part and dissenting in part.

**ARGUED:** Timothy Bosson, BOSSON LEGAL GROUP, Fairfax, Virginia, for Appellant. Caroline D. Lopez, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Chad A. Readler, Principal Deputy Assistant Attorney General, Marleigh D. Dover, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

THACKER, Circuit Judge:

Appellant Hannah P.[1] ("Hannah"), a former employee of the Office of the Director of National Intelligence ("Appellee"), asserts that Appellee discriminated against her pursuant to the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701, *et seq.*, and violated the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*, by not hiring her for a permanent position. The district court granted summary judgment in Appellee's favor as to all claims.

For the reasons explained below, we affirm the district court's judgment as to the Rehabilitation Act and FMLA retaliation claims. However, because a genuine issue of material fact remains as to whether Hannah provided notice of her disability and interest in FMLA leave sufficient to trigger Appellee's duty to inquire, we hold that summary judgment as to Hannah's FMLA interference claim was not warranted. Accordingly, we vacate that part of the district court's judgment and remand Hannah's FMLA interference claim for further proceedings.

I.

A.

In March 2011, Appellee hired Hannah for a five-year term as an operations analyst. In that position, Hannah participated in "long-term, in-depth studies into issues

---

[1] Pursuant to a protective order, Hannah is identified by her first name and last initial.

3

that had particular budgetary importance for the [c]ommunity." J.A. 18.[2] Hannah generally received glowing reviews from her supervisors. *See, e.g.*, *id.* at 412 (describing Hannah's performance prior to 2015 as "outstanding" and noting her "energy/drive, technical competence, superb communication and networking skills, and superior analytic tradecraft"); *id.* at 350 (describing Hannah as "a high-performing employee"); *id.* at 391–410 (describing, repeatedly, various elements of Hannah's performance as "excellent" and "outstanding").

B.

A few months after she was hired, Hannah was diagnosed with depression. Hannah immediately informed at least two of her supervisors of her diagnosis, but she did not request any accommodations at that time. Hannah treated her depression by seeing a counselor and a psychiatrist and by taking prescribed medication.

In November 2013, Hannah was assigned to coordinate the responses of the National Intelligence Director and Principal Deputy Director to Edward Snowden's unauthorized disclosures.[3] This role was "high stress" and required "frequent long hours and weekend work coupled with meeting tight deadlines and dealing with a demanding

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[3] In 2013, National Security Agency subcontractor Edward Snowden leaked "the biggest cache of top-secret documents in history," which revealed numerous global surveillance programs run by the United States government. Ewen MacAskill & Alex Hern, *Edward Snowden: 'The People Are Still Powerless, but Now They're Aware,'* Guardian (June 4, 2018), https://www.theguardian.com/us-news/2018/jun/04/edward-snowden-people-still-powerless-but-aware.

[National Security Council] customer." J.A. 412. In fact, to accommodate the schedule change that this role required, Appellee moved Hannah to a "maxi flex" schedule. *Id.* at 350–51. A "maxi flex" schedule requires an analyst to work a certain number of hours -- 80 hours over a two-week period -- but does not dictate the exact hours that the analyst must work per day. For Hannah, that meant starting and ending work later than traditional business hours.

The Snowden assignment lasted 18 months and completed in January 2015. However, Hannah continued her atypical working hours beyond the completion of the Snowden assignment. Hannah's supervisor "was expecting" that when the Snowden assignment ended, Hannah's hours "might become more normal." J.A. 353. However, for the first few months, he did not communicate with Hannah about returning to normal business hours. Rather, he explained, he was "primarily concerned about establishing what [Hannah's] next task was going to be." *Id.*

By March 2015, Hannah's co-workers perceived her schedule to be "erratic." J.A. 413. Hannah arrived to work well after normal business hours and racked up numerous unplanned absences. On some occasions Hannah was "extremely late," sometimes arriving after 2 PM. *Id.* On other occasions Hannah was unreachable for hours, often missing and failing to return "repeated phone calls to her cell and home phone." *Id.* When Hannah's supervisors were able to reach her, they noted that she seemed "either lethargic or almost unconcerned" about her lateness and absences. *Id.* They also noted that her demeanor was "sad, very flat, and almost trance like." *Id.* Around that time, Hannah informed her supervisors that she "had a recent change in medication." *Id.*

5

C.

1.

Appellee made some accommodations for Hannah following the Snowden assignment. First, after consulting with Hannah in January 2015, Appellee lightened Hannah's workload "to give her a chance to decompress" from the stress of the Snowden assignment. J.A. 413 (internal quotation marks omitted). Second, multiple of Hannah's supervisors had "informal counseling sessions" with her "to discuss any issues that she might be having" and to "urge her" to notify them if she was going to be late or absent. *Id.*

On March 19, 2015, one of Hannah's supervisors met with Hannah directly to address her attendance issues. Together, Hannah and her supervisors developed a plan to reconcile Hannah's depression with Appellee's staffing needs. According to that plan, Hannah was to arrive to work by 10 AM. If she was going to be absent or later than 10 AM, Hannah was to contact one of her supervisors in advance. If Hannah had not arrived at work or contacted a supervisor by 11 AM, a supervisor would call her to determine when she would arrive.

But, Hannah did not follow the plan. For example, the very next day after she and her supervisors developed the plan, Hannah emailed her supervisors at 11:05 AM to inform them that she would be arriving after 12 PM. Similarly, on March 31, Hannah emailed her supervisors at 11:56 AM to inform them that she would not be coming into work at all that day. On April 1, after Hannah had not arrived to work or contacted her supervisors, Hannah's second-level supervisor called her at 12:30 PM, at which time

6

Hannah reported "being unable to just get going." J.A. 413. Later that day, when Hannah finally arrived to work, her supervisor informed her that the plan they created was not working.

At that same time, her supervisor revised the plan to require Hannah to arrive at work by 10 AM or report to her supervisors in advance if she was going to be late or absent. This "put the onus" on Hannah to contact her supervisors, rather than asking her supervisors to contact her if she had not arrived at work by 11 AM. J.A. 90. Hannah failed to follow this modified plan as well. In fact, she failed to comply on April 2 and April 3, the two days following the meeting where the plan was modified.

According to Appellee, Hannah's timeliness and attendance issues impacted her performance, the performance of her peers, and the performance of her supervisors. Per Appellee, Hannah's "erratic" schedule was "noted by her teammates" and affected "unit cohesion." J.A. 413. Hannah's failure to report her tardiness and absences as well as her unresponsiveness required her management team to spend "significant time and energy" tracking her down. *Id.* Additionally, because of Hannah's absences, Hannah's supervisors were often forced to assign work that might have been assigned to Hannah to other analysts.

2.

On April 9, 2015, just three weeks after the initial work plan was developed to attempt to accommodate Hannah's needs, Hannah again met with her supervisors. At this meeting, Hannah's supervisors informed her that they were referring her to the Employee Assistance Program ("EAP"). EAP is a voluntary counseling service for

7

employees and their family members that provides "free, confidential, short-term mental health[,] financial, and addictions counseling and referral to cleared community providers." J.A. 132. Hannah's supervisors made an EAP appointment for her for the following day, Friday, April 10. At that time, Hannah explained to her supervisors that her psychiatrist recommended she take four weeks of medical leave. But, Hannah's supervisors insisted that she would need to meet with EAP before they could approve her request for medical leave.

On the next business day following Hannah's EAP session -- Monday, April 13 -- Hannah's supervisor told Hannah he was willing to authorize her to take medical leave. However, at that point, Hannah informed her supervisor that her leave request was "on hold," without further explanation. J.A. 170, 178.

On April 16, Hannah's supervisor noted in an email that he had an "extended" 40-minute discussion with Hannah's EAP psychologist. J.A. 604. Hannah alleges that the EAP psychologist "shared with [Hannah's supervisor] details of what Hannah had revealed in confidence at the EAP sessions." Appellant's Br. 17. Specifically, Hannah alleges that the EAP psychologist told her supervisor that Hannah was concerned about Appellee's records retention policies, and that Hannah's "difficulties in getting to work were the result of a lack of motivation, not related to depression." J.A. 540.

3.

Despite Hannah's participation in EAP, her attendance problems persisted. For example, on April 13, 2015, Hannah emailed her supervisors at 10:58 AM to inform them that she would arrive to work by 11:30 AM. Similarly, on April 14, Hannah emailed her

8

supervisors at 11:08 AM to inform them that she would arrive to work by 12 PM. That day, Hannah's supervisors were not able to confirm her arrival to work until after 1:50 PM.

A week after advising her supervisors that her leave request was "on hold," on April 21, Hannah renewed her request for four weeks of medical leave. Hannah's supervisors approved that request on May 5. They required her to use her annual leave to account for four-fifths of the four week leave period, and allowed her one day of sick leave per week to make up the rest. Hannah began her leave the day it was approved.

On May 4, the day before Hannah began her leave of absence, Hannah's supervisors gave her a letter of expectations. That letter confirmed the revised attendance and reporting plan. This plan required Hannah to arrive to work by 10 AM or report to her supervisors by 9:30 AM if she was going to be late or absent.

4.

During this time, Hannah applied for three permanent positions within the Office of the Director of National Intelligence. In February 2015, Hannah interviewed for two permanent positions for which she was not selected. Shortly before taking her leave of absence in May 2015, Hannah applied for a third full-time position, the Program Mission Manager Cyber Position ("Cyber position"). She was interviewed for the Cyber position on June 9, eight days after she returned from leave, and the interview panel recommended her for the position. Her application was then forwarded to Appellee's Chief Management Officer, Mark Ewing, who recommended that Hannah not be selected for the position "at this time," stating that Hannah's "recent performance is not consistent

9

with a potentially good employee." J.A. 232. Hannah was informed that her application had been rejected in early July 2015, and she did not apply for any other positions. Hannah completed her five-year term with Appellee in March 2016.

D.

Hannah exhausted her administrative remedies and filed this lawsuit on August 12, 2016. She alleged that Appellee violated the Rehabilitation Act in five ways: (1) failing to accommodate her mental illness; (2) creating a hostile work environment; (3) requiring her to undergo a medical examination; (4) disclosing her confidential medical information; and (5) refusing to hire her for the Cyber position. Additionally, Hannah alleged that Appellee violated the FMLA in two ways: (1) by interfering with her ability to take medical leave; and (2) by retaliating against her when she took medical leave. After the close of discovery, Appellee moved for summary judgment on all counts. The district court granted that motion on July 27, 2017. Hannah filed this timely notice of appeal challenging the district court's decisions on all but the hostile work environment claim.

II.

We review a district court's decision to grant summary judgment de novo. *See Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016). In doing so, this court applies the same standard as the district court. *See id.* That standard requires the court to grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Vannoy*, 827 F.3d at 300. We construe the evidence in the light most

favorable to Hannah, the nonmovant, and we draw all reasonable inferences in her favor. *See Vannoy*, 827 F.3d at 300.

## III.

Hannah asserts that Appellee violated the Rehabilitation Act by failing to accommodate her depression, wrongfully requiring her to undergo a medical examination, unlawfully disclosing her confidential medical information, and refusing to hire her for the Cyber position. Additionally, Hannah asserts that Appellee interfered with and retaliated against her for using leave under the FMLA. We will address each of these claims in turn.

## A.

### *Rehabilitation Act Claims*

The Rehabilitation Act prohibits federal agencies from discriminating against its employees on the basis of disability. *See* 29 U.S.C. § 794. For the reasons explained below, Hannah failed to satisfy her burden on each of her claims under the Rehabilitation Act. Specifically, Hannah failed to: (1) demonstrate that Appellee failed to accommodate her depression; (2) demonstrate that Appellee's EAP amounted to a required medical examination; (3) demonstrate that Appellee disclosed or misused confidential medical information; and (4) rebut Appellee's legitimate, nondiscriminatory reason for rejecting her application for a permanent position.

11

1.

*Reasonable Accommodation*

Turning first to Hannah's claim that Appellee failed to accommodate her depression, the district court correctly concluded that Hannah did not establish a prima facie case because Hannah failed to demonstrate that Appellee refused to make a reasonable accommodation.

To establish a prima facie claim of failure to accommodate under the Rehabilitation Act, a plaintiff must demonstrate that (1) she was a qualified person with a disability; (2) the employer had notice of the disability; (3) the plaintiff could perform the essential functions of the position with a reasonable accommodation; and (4) the employer nonetheless refused to make the accommodation. *See Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 414 (4th Cir. 2015). The district court concluded that Hannah could not establish the fourth element -- specifically, the district court determined that Appellee provided Hannah with at least two reasonable accommodations. And, on appeal, the parties dispute only the fourth element.

Here, as detailed above, Appellee provided Hannah with a reasonable accommodation. When Hannah failed to follow that plan, Hannah's supervisors attempted a new accommodation -- referring Hannah to EAP. Yet, despite Hannah's participation in EAP, her attendance problems persisted.

Hannah argues that Appellee's accommodations were not reasonable for two reasons. First, she claims that the accommodation was improperly rescinded when her supervisors concluded that the first plan was not working. Hannah asserts that the

12

Rehabilitation Act requires a collaborative process. Hannah argues that rather than collaborating with her to identify a workable accommodation, Appellee unilaterally decided that the first plan was not working, then unilaterally decided that Hannah should participate in EAP counseling instead. Although employers have a duty to engage with their employees in an "interactive process to identify a reasonable accommodation," *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346 (4th Cir. 2013), the employer "has the ultimate discretion to choose between effective accommodations." *Reyazuddin*, 789 F.3d at 415–16 (citing *Hankins v. Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996)). Nonetheless, even under Hannah's view of the record, Appellee *did*, in fact, collaborate with Hannah in establishing the first accommodation and only acted unilaterally when that accommodation did not work.

Second, Hannah claims that a reasonable accommodation that she requested -- a leave of absence -- was improperly delayed. Hannah posits that she "suffered immense emotional stress during this one month lapse of [Appellee's] compliance with the law." Appellant's Br. 37. This argument is without merit and is not supported by the record, even when viewed in the light most favorable to Hannah. Hannah first requested the leave of absence on April 9, 2015. Then, on April 13 -- just two business days later -- Hannah withdrew her request without explanation, telling her supervisor that her leave request was "on hold." J.A. 170, 178. Hannah then renewed her request for leave on April 21, and her request was approved on May 5. Thus, there was no "one month lapse," since Hannah's request was "on hold" for nine days of that time.

During the remaining gap between Hannah's request for leave and Appellee's approval of that request, Appellee referred Hannah to its counseling service. The Rehabilitation Act does not require an employer to provide the exact accommodation that an employee requests. *See Reyazuddin*, 789 F.3d at 415 ("An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested."). Further, the record demonstrates that Hannah's supervisors were actively considering her request for leave during that time, and they did ultimately approve it less than a month after she first requested leave.

For these reasons, granting summary judgment to Appellee on Hannah's reasonable accommodation claim was proper.

2.

*Required Medical Examination*

Under the Rehabilitation Act, an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

a.

*Examination of a Job Applicant*

As an initial matter, Hannah's arguments related to pre-employment medical examinations under the Rehabilitation Act[4] miss the mark because Hannah was a current employee, not a job applicant. Although Appellee knew Hannah was considering applying for permanent positions with Appellee at the time she was referred to EAP, she had not yet done so. The evidence is clear that Appellee referred Hannah to EAP in lieu of disciplining her for her attendance issues in her then-current position, rather than as a pre-employment medical examination. Moreover, the fact that Hannah's attendance issues may have been related to her stress and frustration surrounding obtaining permanent employment with Appellee does not transform her EAP referral into a pre-employment medical examination.

b.

*Examination of a Current Employee*

Further, Hannah failed to demonstrate, much less create a genuine issue of material fact, that EAP constituted a prohibited medical examination of a current employee. We note that EAP's policies make clear that EAP is intended to be used as a voluntary counseling service, and not as a mandatory medical examination that would

---

[4] Subject to certain exceptions, an employer "shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability." 42 U.S.C. § 12112(d)(2)(A).

violate the Rehabilitation Act. *See* J.A. 130 ("[U]tilizing EAP is always voluntary and therefore the employee has the right to decline to attend treatment, even if management-referred."). Additionally, Hannah's EAP counselor repeatedly stated that she did not conduct a medical examination:

> I did not conduct a medical examination of [Hannah], and I did not conduct a mental health evaluation or diagnostic assessment because a) [Hannah] informed me she was already in treatment and b) . . . it is not in EAP's purview to conduct a medical evaluation. I did not administer any medical or mental health tests or diagnostic assessment tools for the same reason. I was [n]ot tasked to diagnose or provide a second opinion; my role was to facilitate communication between [Hannah] and Management to resolve the problem presented in the Management Referral -- namely, improving attendance and notifying management when not attending work.

*Id.* at 188 (emphasis omitted).

However, even if EAP constituted a mandatory medical examination under the facts of this case, summary judgment to Appellee was still appropriate on this claim because Hannah's referral to EAP was "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). As we have stated, "whether a mental examination was 'job-related and consistent with business necessity' is an objective inquiry." *Pence v. Tenneco Auto. Operating Co.*, 169 F. App'x 808, 812 (4th Cir. 2006). "We therefore do not resolve any dispute about what [Appellee's] subjective motivations were for having [Hannah] examined by the EAP." *Id.* An employer's request for a medical examination is job-related and consistent with business necessity when: "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential

16

functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014).

Here, the evidence, even when viewed in the light most favorable to Hannah, supports granting summary judgment because Appellee had a reasonable belief that Hannah's ability to perform the essential functions of her job was impaired by her repeated issues with attendance and timely reporting. Hannah attempts to refute this by asserting that her job performance was excellent, but job performance alone does not create a genuine issue of material fact. Attendance was also an essential function of Hannah's job, one the record amply demonstrates she was unable to fulfill when Appellee referred her to EAP. As we have stated:

> In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise." Therefore, a regular and reliable level of attendance is a necessary element of most jobs.

*Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Wimbley v. Bolger*, 642 F. Supp. 481, 485 (W.D. Tenn. 1986), *aff'd*, 831 F.2d 298 (6th Cir. 1987)) (emphasis in original); *see also Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 380 (6th Cir. 2007) ("Job performance is separate from the ability to show up for work, an essential function of [Hannah's] position.").

Accordingly, Appellee did not violate the Rehabilitation Act by referring Hannah to EAP, and the district court properly granted summary judgment to Appellee on this claim.

3.

*Confidential Medical Information*

Under the Rehabilitation Act, an employer may "conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program" and may "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). Any "information obtained regarding the medical condition or history of the applicant" -- that is, medical information -- must be "collected and maintained on separate forms and in separate medical files and [must be] treated as a confidential medical record." *Id.* § 12112(d)(3)(B); *see also id.* § 12112(d)(4)(C).

Hannah alleges two separate Rehabilitation Act violations regarding her medical information: first, that Hannah's supervisors wrongfully sought and disclosed confidential medical information elicited from Hannah, and second, that the EAP psychologist wrongfully disclosed confidential medical information gathered from the EAP session to Hannah's supervisors. In both instances, the district court correctly determined that Hannah failed to demonstrate that Appellee violated the Rehabilitation Act.

18

*Disclosures by Supervisors*

Hannah asserts that her supervisors disclosed her confidential medical information by writing in her EAP referral memo, "[e]arly in her tenure . . . and reaffirmed recently, [Hannah] informed us that she was meeting with a psychiatrist and counselor and taking medication for depression." J.A. 413. Notably, Hannah voluntarily disclosed her depression diagnosis to her supervisors. The Rehabilitation Act does not protect information shared voluntarily. *See Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012) (finding the district court properly granted summary judgment on a confidentiality claim brought under the Rehabilitation Act because the record "clearly show[ed]" that the appellant "disclosed his medical condition voluntarily"). Indeed, Hannah voluntarily told at least four of her supervisors that she had been diagnosed with depression. *See* J.A. 179 (Hannah's interrogatory responses) ("I disclosed my diagnosis of depression to my supervisors Kelly G. in summer 2011, Ann W. in fall 2014; Art Z. in March 2015, and Roy P. in March 2015.").

Hannah argues that these disclosures were not voluntary because they were made in response to inquiries about her disability. But the evidence does not support or create a genuine issue of fact about that argument. The record indicates that only the March 2015 disclosure was made in response to an inquiry, and that inquiry was not medical -- it was about her attendance. *See* J.A. 23 (Hannah's deposition testimony) ("[H]e was concerned about unpredictability in my schedule. . . . I told him at that time I had depression.").

Hannah asserts that this inquiry about her attendance was de facto an inquiry into her depression because (according to Hannah) the inquiring supervisor knew she was depressed and knew her attendance issues were linked to her depression. Hannah cites only out-of-circuit cases for the proposition that asking a question "likely to elicit" information about a disability amounts to a medical inquiry. *See Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1216 (11th Cir. 2010) (concluding that whether an inquiry following a failed drug test was likely to elicit information about a disability in violation of the Americans with Disabilities Act ("ADA")[5] presented a question of fact for a jury to resolve); *Fleming v. State Univ. of N.Y.*, 502 F. Supp. 2d 324, 338 (E.D.N.Y. 2007) (concluding the plaintiff pled facts sufficient to state a claim for failure to confidentially maintain medical information under the ADA where the plaintiff alleged that his disclosure of his sickle cell anemia was not voluntary because his supervisor called him while he was in the hospital and asked him why he was there).

First, the record does not support Hannah's argument that the supervisor in question knew about Hannah's depression before she disclosed it to him. Hannah points to the supervisor's statement that when he spoke to Hannah on the phone before confronting her about her attendance, "she didn't sound well on the other end of the phone." J.A. 466. Hannah also points to her supervisor's statement that Hannah's "demeanor [wa]s sad, very flat, and almost trance like." *Id.* at 413. This is not enough to

---

[5] "To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).

create a genuine issue of material fact as to whether the inquiring supervisor knew Hannah had been medically diagnosed with clinical depression, or whether by asking about her attendance, the supervisor was fishing for medical information about Hannah's illness.

Second, even if Hannah's supervisor had an inkling that Hannah may have had depression, this is not evidence that he knew asking about her repeated absences and tardiness -- indisputably bad work behavior -- would elicit medical information related to her depression. Indeed, Hannah's absences could have been the result of a world of other, nonmedical possibilities, such as transportation issues or oversleeping. Adopting Hannah's argument would require us to find that where an employer might know that a particular bad work behavior is connected to a medical condition, the employer cannot inquire into the behavior without running afoul of the ADA and Rehabilitation Act's prohibition on medical inquiries. We have held expressly the opposite: "[T]he ADA does not require an employer to simply ignore an employee's blatant and persistent misconduct, even where that behavior is potentially tied to a medical condition." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 305 (4th Cir. 2016) (citing *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999) (holding the ADA does not "require an employer to ignore such egregious misconduct by one of its employees, even if the misconduct was caused by the employee's disability")).

21

b.

*Disclosures by EAP Psychologist*

Hannah also argues that, in addition to her supervisors disclosing her depression diagnosis internally, the EAP psychologist disclosed "additional, unique information from what Hannah had already told her supervisors." Appellant's Br. 51. Specifically, Hannah alleges that the EAP psychologist told her supervisor that Hannah was concerned about Appellee's records retention policies, and that Hannah's "difficulties in getting to work were the result of a lack of motivation, not related to depression." J.A. 540.

Perhaps that is true. The record does indicate that the EAP psychologist shared some information with Hannah's supervisors and maybe it was unique information. *See* J.A. 192 (EAP psychologist statement) (noting that the psychologist provided Hannah's supervisors updates regarding Hannah's "EAP attendance" and "cooperation and progress toward resolving the referral issues"). But there is no evidence that the EAP psychologist shared *medical information*. To the contrary, the EAP psychologist insisted, again and again, that she did not share any confidential medical information. *See id.* at 190 (noting that the psychologist, who is not a doctor, "did not disclose any confidential medical information" to anyone). Of note, Hannah did not point to any evidence in the record contradicting the psychologist's assertions.

Therefore, the information shared by the EAP psychologist did not trigger the Rehabilitation Act's confidentiality protections because the record indicates that the EAP psychologist shared only nonmedical information.

c.

*Non-Reliance on Medical Information*

Finally, even if either Hannah's supervisors or the EAP psychologist disclosed Hannah's medical information, Appellee still did not violate the Rehabilitation Act because Appellee did not rely on Hannah's depression diagnosis or any other medical information in deciding not to hire Hannah for the Cyber position. Rather, the record overwhelmingly indicates that Appellee's decision was based on Hannah's attendance issues. Accordingly, Hannah has not demonstrated that Appellee violated the Rehabilitation Act by disclosing or misusing confidential medical information.

4.

*Discrimination*

Rehabilitation Act claims for discrimination are reviewed under the *McDonnell Douglas* burden-shifting framework. *See Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *Perry v. Comput. Scis. Corp.*, 429 F. App'x 218, 219–20 (4th Cir. 2011). Under that framework, Hannah has the initial burden of establishing a prima facie case of discrimination. *See Perry*, 429 F. App'x at 220. To establish this prima facie case, Hannah must show that: (1) she is disabled; (2) she was otherwise qualified for the position; and (3) she suffered an adverse employment action solely on the basis of her disability. *See id.* (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

23

If Hannah establishes a prima facie case, the burden shifts to Appellee to provide a legitimate, nondiscriminatory reason for its conduct. *See Perry*, 429 F. App'x at 220. If Appellee provides such a reason, Hannah "bears the ultimate burden of persuasion" and "must show by a preponderance of the evidence that the proffered reason was a pretext for discrimination." *Id.*

a.

*Establishing Pretext*

Even assuming that Hannah established a prima facie case of discrimination (which Appellee disputes), she cannot succeed on her claim that Appellee discriminated against her by not hiring her for a permanent position because she did not sufficiently rebut Appellee's proffered reason for rejecting her application, as required under the final step of the *McDonnell Douglas* burden-shifting framework. *See Perry*, 429 F. App'x at 220.

Appellee presented evidence demonstrating that Hannah's perpetual issues with attendance, timeliness, and reporting absences to her superiors were the bases of its decision not to hire her for the permanent position. Attempting to expose that explanation as a ruse, Hannah pointed to a purported inconsistency between the sworn statement that Mark Ewing provided during the Equal Employment Opportunity Commission ("EEOC") investigation of Hannah's case and an email he sent more than a

24

year earlier. In the sworn statement, signed on April 26, 2016,[6] Ewing asserts he "had no knowledge of [Hannah's] disability." J.A. 650. But in the email, sent on June 30, 2015, Ewing references two memos that he received from Hannah's supervisors, both of which note Hannah's depression. *See id.* at 413 (April 9, 2015 memo) ("Early in her tenure . . . and reaffirmed recently, [Hannah] informed us that she was meeting with a psychiatrist and counselor and taking medication for depression."); *id.* at 606 (April 23, 2015 memo) ("While . . . medical considerations (i.e., depression and/or ADD) do make this situation worse, these factors are under her control based upon treatment plans with her psychologist and psychiatric care providers."). Underscoring the significance of this inconsistency, Hannah argues, is the fact that Ewing did not provide the June 30, 2015 email to the EEOC. Hannah argues that the inconsistency, coupled with Ewing's failure to disclose the email evidencing the inconsistency, illustrates "clear pretext." Appellant's Br. 27.

Despite Hannah's arguments to the contrary, this apparent discrepancy does not create a genuine issue of material fact that Appellee's proffered reason for rejecting Hannah's application is pretextual. First, nothing in the record indicates that Ewing had first-hand knowledge of Hannah's disability. Although the memos mention that Hannah self-reported that she had depression, the second memo also describes Hannah's depression as "under her control." J.A. 606. Indeed, Ewing's email suggests that he did

---

[6] The excerpt of the statement that is included in the J.A. does not include the date. This date comes from Hannah's brief. *See* Appellant's Br. 26.

25

not know that Hannah had an ongoing disability. *See* J.A. 635 ("I am informed that EAP concluded that [Hannah] does not have a medical problem, rather she is a disciplinary problem.").

More significantly, Hannah's asserted contradiction between Ewing's EEOC statements and his June 30, 2015 email do not create a genuine issue of material fact about pretext because Ewing's email and the memos written by Hannah's supervisors focus on Hannah's attendance problems, not on her disability. *See* J.A. 413 (April 9, 2015 memo) (noting that "[Hannah's] schedule has become increasingly erratic" and that "frequent absences and late arrivals [have begun] to affect her assigned unit and individual performance"); *id.* at 606 (April 23, 2015 memo) (describing Hannah's history of attendance issues and Appellee's attempts to accommodate Hannah and noting that, despite those attempts, "[Hannah's] late attendance has continued"); *id.* at 635–36 (Ewing's June 30, 2015 email) (detailing Hannah's problem with "attendance at work," noting that Hannah's "absences and late arrivals were affecting her assigned staff element and her individual performance," and concluding that Hannah's "recent performance is not consistent with a potentially good employee.").

Accordingly, Hannah did not point to any genuine issue of material fact that Appellee's purported basis for not hiring her was merely a pretext for discriminating against her on the basis of her depression.

b.

*Appellee's Nondiscriminatory Explanation*

i.

Moreover, the record indicates that Appellee's proffered explanation for not hiring Hannah for the Cyber position is genuine, legitimate, and nondiscriminatory.

As the district court concluded, a continuous attendance issue is a legitimate reason for withholding an employment benefit. *See Tyndall*, 31 F.3d at 213 (finding an employee who cannot satisfy their employer's attendance policy cannot be considered "qualified" for the purposes of the ADA). Hannah might have been exceptionally talented and substantively good at her job, but as noted above, "[i]n addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis." *Id.*

Hannah asserts that "serious questions of fact exist as to whether Hannah even had 'significant attendance and reporting problems.'" Appellant's Br. 28. But the record evidences no less than 13 attendance issues that occurred in the 46 days between Appellee's first attempt to accommodate Hannah on March 19, 2015, and the revised plan made on May 4, 2015. *Compare* J.A. 114, 174 (noting Appellee's March 19, 2015 meeting with her supervisor and original accommodation asking her to arrive at work by 10 AM or report to a supervisor), *with id.* at 556 (indicating four unexcused absences and

27

nine late arrivals between March 19 and April 29 that Appellee failed to timely report).[7]

In light of Hannah's failure to arrive or call in before 10 AM 13 times in 46 days, there is

no genuine issue of material fact about Hannah's significant attendance and reporting

problem.

ii.

Hannah also argues that because her disability was the cause of her attendance

issues, Appellee could not withhold an employment benefit from her on that basis. We

have no doubt that Hannah's struggle with depression was the cause of her attendance

issues, and we are sympathetic to the toll this condition took on a highly talented

---

[7] The record reflects the following late arrivals and absences for Hannah between March 19, 2015, and May 4, 2015: (1) April 2: Hannah emailed at 11:02 AM indicating she would arrive to work by 12 PM; (2) April 8: Hannah emailed at 11:05 AM indicating she would arrive to work by 12 PM; Hannah emailed again at 1:55 PM indicating she would not be coming in that day; (3) April 9: Hannah emailed at 11:11 AM indicating her car was towed and she would arrive at work by 1 PM; (4) April 13: Hannah emailed at 10:58 AM indicating she would arrive at work by 11:30 AM; (5) April 14: Hannah emailed at 11:08 AM indicating she would arrive at work by 12 PM; (6) April 16: Hannah's supervisor emailed Hannah at 10:18 AM looking for her; when Hannah was reached at 11 AM, she indicated she would arrive to work by 12 PM; (7) April 20: Hannah emailed at 10:45 AM indicating she would arrive to work by 11:30 AM; Hannah's supervisor confirmed her arrival at 12:50 PM; (8) April 22: Hannah emailed at 11:01 AM indicating she would arrive at work after 12 PM; Hannah emailed again at 12:41 PM indicating she would arrive at 1 PM due to traffic; (9) April 23: Hannah emailed at 10:59 AM indicating she would arrive at work by 12 PM; Hannah emailed again at 12:56 PM indicating she would not be coming in that day due to a migraine; (10) April 24: Hannah emailed at 11:02 AM indicating she would arrive at work in the afternoon; Hannah later called at 3:24 PM indicating she would not be coming in that day; (11) April 27: Hannah's supervisor emailed indicating Hannah arrived at work by 11 AM; (12) April 28: Hannah emailed at 10:52 AM indicating she would arrive at work by 11:30 AM; (13) April 29: Hannah emailed at 11:49 AM indicating she would not come in to work that day. *See* J.A. 556.

28

employee. However, Appellee was nevertheless permitted to take Hannah's attendance issues into account in its decision whether to hire her for the Cyber position. To reiterate, the Rehabilitation Act "does not require an employer to simply ignore an employee's blatant and persistent misconduct, even where that behavior is potentially tied to a medical condition." *Vannoy*, 827 F.3d at 305; *cf. Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n.3 (4th Cir. 1997) ("Misconduct -- even misconduct related to a disability -- is not itself a disability, and an employer is free to fire an employee on that basis.").

iii.

Finally, Hannah argues that by the time Appellee made the decision not to hire her, her attendance had improved. She asserts that between returning from her leave of absence on June 1, 2015, and learning that she was not selected for the permanent position on June 17, 2015, she "had shown she was able to perform the essential functions of the job and had no current attendance issues." Appellant's Br. 32.

Hannah is correct that in a failure to hire case, the relevant inquiry is the candidate's performance "at the time of the employment decision or in the immediate future." *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 57 (4th Cir. 2002). However, Appellee was not required to consider the two weeks before the decision was made in a vacuum. Moreover, it is not the job of this court to decide whether Appellee made the right choice by not hiring Hannah for the Cyber position. Rather, our job is simply to decide whether Appellee made an *illegal* choice. *See Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 350 (4th Cir. 2014) (explaining that we do not "sit as a kind of super-personnel department weighing the prudence of employment decisions").

29

Because Hannah not did demonstrate that Appellee's purported basis for not hiring her was merely a pretext for discriminating against her on the basis of her depression, and because Hannah's attendance problem was a legitimate and nondiscriminatory reason to not hire her, we conclude that summary judgment was appropriate on her Rehabilitation Act discrimination claim.

B.

*FMLA Claims*

The FMLA gives employees with qualifying medical conditions the right to take up to 12 weeks of leave during a 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of" her job. 29 U.S.C. § 2612(a)(1)(D). "The employee has an accompanying right to return to the same or an equivalent position at the conclusion of the leave period." *Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 923 (4th Cir. 2007) (citing 29 U.S.C. § 2614(a)(1)).

As discussed below, as to Hannah's FMLA interference claim, Hannah illustrates a genuine issue of material fact regarding the notice of her depression and her desire to take a leave of absence. But, for the same reasons Hannah's Rehabilitation Act discrimination claim fails, Hannah's FMLA retaliation claim fails as well.

1.

*Interference*

a.

The district court incorrectly concluded that Hannah's disclosure of her depression was not sufficient to put Appellee on notice that Hannah could have qualified for FMLA

30

protections.  Accordingly, summary judgment was not warranted as to Hannah's FMLA interference claim.

"An employee is mandated to provide notice to her employer when she requires FMLA leave."  *Brushwood v. Wachovia Bank, N.A.*, 520 F. App'x 154, 157 (4th Cir. 2013) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 382 (4th Cir. 2001)).  That said, an employee need not specifically invoke the FMLA to benefit from its protections.  *See Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009).  Proper notice does not require "any magic words."  *Id.*  Indeed, "[w]hen an employee seeks leave for the first time for a[n] FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.302.  Proper notice merely "makes the employer aware" that the employee needs potentially FMLA-qualifying leave.  *Brushwood*, 520 F. App'x at 157.  And once the employer is on notice of the employee's need to take potentially FMLA-qualifying leave, "the responsibility falls on the employer to inquire further about whether the employee is seeking FMLA leave."  *Dotson*, 558 F.3d at 295.

A reasonable jury could find that Hannah's disclosure of her depression and her April 9, 2015 request for psychiatrist-recommended leave was sufficient to trigger Appellee's responsibility to inquire further about whether Hannah was seeking FMLA leave.  We have held that disclosure of a potentially FMLA-qualifying circumstance and an inquiry into leave options is sufficient to create a material question of fact regarding whether an employee triggered her employer's FMLA obligations.  *See Dotson*, 558 F.3d at 291, 295 (finding that an employee informing his employer that he was adopting a

31

child and speaking to a human resources representative about "taking leave during the adoption process" was sufficient to create a question of fact as to whether the employer's FMLA-inquiry duties had been triggered).

b.

Here, Hannah informed her supervisors of her depression on multiple occasions. *See, e.g.*, J.A. 413 (April 9, 2015 memo from Hannah's supervisors) ("Early in her tenure . . . and reaffirmed recently, [Hannah] informed us that she was meeting with a psychiatrist and counselor and taking medication for depression.").[8]  And on April 9, 2015, Hannah explained to her supervisors that her psychiatrist recommended that she take four weeks of medical leave.  Hannah's disclosures about her depression and her psychiatrist's recommendation could lead a reasonable jury to find that Appellee was on notice that Hannah was inquiring about potentially FMLA-qualifying leave, triggering Appellee's responsibility to inquire further about whether Hannah was seeking FMLA leave.[9]

c.

Appellee argues that Hannah's interference claim fails because Hannah cannot demonstrate that her depression was "a serious health condition."  Appellee's Resp. 40–41; *see also* 29 U.S.C. § 2612(a)(1)(D).  But that argument is premature.  Appellee has

---

[8] Indeed, Hannah's supervisors had "grown increasingly alarmed at the overall change in [Hannah's] demeanor."  J.A. 413.

[9] It is undisputed that Appellee did not inquire about whether the leave should be classified as FMLA-protected.

not shown that it made any inquiry into whether Hannah's depression was an FMLA-qualifying serious health condition. Appellee's argument "would allow it to use its own failure to determine whether leave should be designated as FMLA-protected to block liability." *Dotson*, 558 F.3d at 295. We have refused "to allow an employer to take advantage of its own lapse in such a way." *Id.*

d.

Additionally, Appellee's failure to provide notice of the availability of FMLA leave prejudiced Hannah because if she had been aware of the availability of FMLA leave, she could have structured her leave differently. The FMLA "provides no relief unless the employee has been prejudiced by the violation." *Vannoy*, 827 F.3d at 302 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). "Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his leave differently." *Id.*

Here, the record contains evidence that if Hannah had known that the FMLA protected her position, she would have used only sick leave for her leave of absence. *See* J.A. 664 (Hannah's declaration) ("Had I known I could have chosen to take sick leave for the entire period, I would have elected to do so."). Instead, she used a combination of sick leave and annual time to take four weeks off. According to Hannah, "[u]nlike annual leave, sick leave is not paid out at the end of an employee's service, resulting in a loss of a benefit worth at least $20,000." *Id.* Based on Hannah's testimony, a jury could

find that Hannah was prejudiced by Appellee's failure to inquire into the availability of FMLA leave and thus interfered with her FMLA rights.

For these reasons, Hannah has demonstrated a genuine issue of material fact that should have precluded summary judgment on her FMLA interference claim.

2.

*Retaliation*

As for Hannah's FMLA retaliation claim, however, the district court correctly concluded that like her discrimination claim brought pursuant to the Rehabilitation Act, Hannah did not sufficiently rebut Appellee's legitimate, nonretaliatory reason for not hiring Hannah for the Cyber position.

The FMLA prohibits employers from discriminating against an employee for exercising her FMLA rights. *See* 29 U.S.C. § 2615(a)(2). As relevant here, "employers cannot use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c). Courts analyze FMLA retaliation claims, like discrimination claims brought pursuant to the Rehabilitation Act, under the *McDonnell Douglas* burden-shifting framework. *See Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013). To establish a prima facie case of FMLA retaliation, a plaintiff must demonstrate that "(1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events." *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 429 (4th Cir. 2015) (internal quotation marks omitted). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, nonretaliatory reason for taking the employment action at issue.

34

*Id.* If the defendant does so, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual. *Id.*

Even assuming Hannah demonstrated a prima facie case of FMLA retaliation, summary judgment was proper because she failed to rebut Appellee's legitimate, nonretaliatory reason for not hiring her for the Cyber position. Appellee asserts that it relied on Hannah's attendance issues in deciding not to hire her for the position, and the evidence in the record supports that assertion. *See* J.A. 635–36 (Ewing's June 30, 2015 email expressing concerns about Hannah's application for the Cyber position) (noting, "despite some apparently solid performance while on the Snowden project," Appellee had "a consistent history of issues with [Hannah] over many months" regarding Hannah's "attendance at work and attitude"); *id.* at 219 (Ewing's deposition testimony) ("The primary reason that I was concerned [about Hannah's application] was the fact that her conduct was extremely negative at the point of time we were making a hiring decision for permanent employment status."). Hannah points to no evidence that adequately undermines Appellee's proffered nonretaliatory reason for not hiring her.[10]

Accordingly, the district court properly granted summary judgment on Hannah's FMLA retaliation claim.

---

[10] Hannah again argues, as she did in the context of her claim of discrimination under the Rehabilitation Act, that the "inconsistency" between the sworn statement Ewing provided during the EEOC investigation of Hannah's case and an email he sent more than a year earlier exposes Appellee's proffered reason for not hiring her for the permanent position as pretextual. For the same reasons explained above, that argument fails.

IV.

For these reasons, we affirm the judgment of the district court as to Hannah's Rehabilitation Act claims and FMLA retaliation claim. We vacate the grant of summary judgment as to Hannah's FMLA interference claim because there is a genuine issue of fact as to whether Hannah's disclosure of her depression was sufficient to put Appellee on notice that Hannah could have qualified for FMLA protections. Accordingly, we remand for further proceedings as to that claim.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

GREGORY, Chief Judge, concurring in part and dissenting in part:

Hannah P. was undisputedly an excellent intelligence officer. The Office of the Director of National Intelligence ("ODNI") entrusted her with the high-stress, high-profile Edward Snowden case. She worked tirelessly and impeccably on that assignment, and ODNI praised her performance. For the duration of that assignment, Hannah kept nonconventional work hours with the knowledge and consent of her supervisors, and her attendance was not considered a problem.

It was only after the Snowden project ended, and Hannah's depression worsened, that her supervisors found fault with her work hours, though she remained formally on a flexible schedule. When Hannah requested an accommodation for her depression—a leave of absence recommended by both of her medical professionals—Hannah's supervisors refused to timely grant the request. This was despite the fact that her supervisors had offered to grant her leave just a few months earlier—before her depression was triggered.

The result of this was tragic. Hannah was denied a permanent position for which it is undisputed that she was exceptionally qualified and for which the interview panel unanimously selected her. ODNI concedes that Hannah's depression qualifies as a disability protected by the Rehabilitation Act. Yet, the employer denied Hannah, a dedicated and valuable employee, the protection that the law requires.

The majority mistakenly fails to see the force of Hannah's claims. Though the majority cites repeatedly to our decision in *Vannoy v. Federal Reserve Bank of Richmond*, it fails to grapple with the stark distinctions between the "blatant and

37

persistent misconduct" by the employee in that case and Hannah's cooperative attempts to satisfy her supervisors' expectations, despite the increasingly severe symptoms of her disability. 827 F.3d 296, 300 (4th Cir. 2016).

While I concur in Parts III.A.2.a, III.A.3, and III.B.1 of the Court's opinion, I cannot agree that no genuine issue of material fact exists with respect to Hannah's claims that ODNI violated the Rehabilitation Act and Family and Medical Leave Act ("FMLA") when it discriminated against her on the basis of her disability, failed to reasonably accommodate her depression, wrongfully required a medical examination of her as a current employee, and chose not to hire her for permanent employment in retaliation for her FMLA-qualifying leave. I believe that several disputes of fact exist and that Hannah is entitled to her day in court. Therefore, I respectfully dissent with respect to those claims.

I.

Hannah's supervisors were informed early in her employment that she suffered from depression. She was under the treatment of a psychiatrist and a licensed clinical social worker and did not initially request any work accommodations because she "was adequately handling [her] depression at the time with medication and counseling." J.A. 19–20.

Despite her depression, Hannah excelled at her job. In her position as the disclosures coordinator for the Edward Snowden project, her "leadership, poise, and performance were impeccable." J.A. 412. She was described by her supervisors as "an

38

outstanding employee combining energy/drive, technical competence, superb communication and networking skills, and superior analytic tradecraft." *Id.* In short, Hannah was considered "an invaluable intelligence officer and a future [Intelligence Community] leader." *Id.*

The high-profile Snowden project required long work hours, and Hannah was not required to maintain an established "core" hours schedule. Instead, she worked a "maxi flex" schedule, which permitted her to vary her schedule so long as she put in 80 hours of work in each two-week period. J.A. 492–93. She often came in later than other ODNI employees (around noon), but stayed later as well. J.A. 494.

In November or December 2014, as the Snowden project was coming to a close, Hannah's supervisors encouraged her to take leave, a common practice for ODNI employees "after finishing a burn-out job." J.A. 173. Hannah did not take her supervisors up on the offer, however, not only because she was interviewing for permanent employment, but also because "there was still ambiguity over whether the [Snowden] disclosures responsibilities had truly finished." *Id.*

During this time, Hannah's depression became more serious. She had trouble arriving at work before noon and had unscheduled absences. Hannah remained on a maxi flex schedule, however, and it was not until March 19, 2015, that she was informed that her attendance and arrival time were problematic. J.A. 461, 495. In fact, her first-line supervisor had no concerns about her attendance or work hours in early 2015 and asked Hannah to fill in as acting chief of their division while he was out of the office in late February. J.A. 494–95, 498.

39

When Hannah's supervisor spoke with her about her work hours on March 19, 2015, Hannah was not told that she was required to return to a "core" schedule. Rather, Hannah and her first-line supervisor agreed that Hannah would either arrive at work by 10:00 a.m. or contact her supervisors if she was unable to arrive by that time; if she neither arrived at work nor contacted the office by 11:00 a.m., her supervisor would reach out to her by phone. J.A. 114. Hannah's second-line supervisor had no objection to the arrangement; he "wanted to see what would happen." J.A. 345.

The day after making this arrangement, Hannah did not report for work by 10:00 a.m. When she did not arrive by 11:00 a.m., her supervisors did not call her. Instead, she emailed them at 11:05 a.m., advising she would be in around 12:30 p.m. J.A. 118.

After that work day, Hannah began a pre-scheduled week-long leave during which she was preoccupied with home renovations. J.A. 114. At the end of the week, she emailed her supervisors to inform them she would not be in Monday, the next business day, because of the renovations. J.A. 120. On Tuesday, Hannah emailed her supervisors notifying them that she would not be in that day either. J.A. 122.

On Wednesday, when Hannah did not come in by 10:00 a.m., Hannah's second-line supervisor called her. J.A. 174. According to Hannah, her supervisor was "angry" and demanded to know why Hannah had not arrived. *Id.* Hannah apologized, explained she was having trouble getting out of bed, and indicated that she would be in as soon as possible. *Id.* When she arrived at work, her supervisor told her that the arrangement they had made "was not working." J.A. 175. She was told that she was solely responsible for contacting the office in the event she would be late or absent, and that her supervisors

40

would not be contacting her. J.A. 90. The arrangement had been in place for a total of four days on which Hannah was scheduled to work.

Hannah asked that her supervisors "give the current accommodation more time to work." J.A. 175. Her supervisor, who was aware of Hannah's depression, insisted that Hannah propose an alternative plan "right then." *Id.* She was ultimately given "a day or two" to propose an alternative. *Id.*

The next day, on April 2, 2015, Hannah emailed her supervisors at 11:02 a.m., notifying them that she would be in by noon. J.A. 124. That day, Hannah's supervisors met with ODNI's Employee Management Relations Officer, the head of ODNI's Equal Employment Opportunity and Diversity Office, and the head of ODNI's Human Resources Division to discuss how to best address Hannah's attendance and reporting. J.A. 66, 128, 149. They collectively decided to refer Hannah to the Central Intelligence Agency's Employee Assistance Program ("EAP").[1] J.A. 326–29. Although Hannah's supervisors were well aware of her depression, she was referred to the EAP to "help identify what her challenges were and provide her any support she needed," such as "accommodation with work hours, . . . counseling or any other type of support." J.A. 139–40.

---

[1] Hannah was referred to the CIA's EAP program because ODNI did not have one of its own. The EAP provides employees with "free, confidential, short-term mental health[,] financial, and addictions counseling and referral to cleared community providers." J.A. 132.

41

Hannah's supervisors drafted a memorandum, which they dated April 9, 2015, referring Hannah to the EAP. The memo outlined Hannah's "impressive capabilities" and her work with ODNI, commented on her recent attendance, and explained that Hannah had disclosed to her supervisors that she was meeting with a psychiatrist and counselor and taking medication for depression. J.A. 412–13. The memo also noted:

> Hannah has indicated that she is struggling to get out of bed in the morning and admits to feeling almost paralyzed. She has also indicated that she had a recent change in medication and that the upheaval in her living arrangements negatively impacted some of her physical coping mechanisms.

J.A. 413. The memo explained that "as senior intelligence officials," Hannah's supervisors "ha[d] a duty to identify and if possible help vulnerable employees." J.A. 414.

Meanwhile, Hannah met with her psychiatrist and counselor. Both professionals agreed that Hannah should take four weeks of leave. J.A. 175. Accordingly, Hannah met with her supervisors on April 9, 2015 and requested a four-week leave of absence. J.A. 424, 449, 468. Her supervisors did not ask her for any medical documentation to support the leave request because they expected to receive a "quick answer" from EAP. J.A. 95. They also believed that Hannah's medical providers did not have "the expertise to provide" an opinion on "all of the items" that they were planning to submit to EPA. *Id.*

Hannah's supervisors denied her leave request; they had already determined before meeting with Hannah that if Hannah asked for leave, they would "defer that decision until after meeting with EAP." J.A. 422. One of Hannah's supervisors explained in her deposition that she "wanted to get a sense [Hannah] was in a good

42

place." J.A. 431. According to that supervisor, the "rationale" of the group that decided to refer Hannah to EAP first was:

> If this were . . . a bad behavior problem, there would be no need to grant immediate leave.

> If it were a medical mental health problem, the thought was, granting leave and isolating [Hannah] from day-to-day contact with her coworkers and her managers when we didn't know her state of mind and how much medical care she was receiving could, potentially, be dangerous.

J.A. 422–23. Hannah's second-line supervisor told her that the decision was made because of concern that "since [Hannah] was a single woman if [she] took leave [she] would be home by [herself] and that could make [her] depression worse." J.A. 176. It was made clear that Hannah was required to attend EAP counseling; if she refused, her temporary position would be deemed "as excess" and she would lose her job "immediately." *Id.*

Hannah's first-line supervisor disagreed with the others' proposed course of action; he believed that the supervisors should not "substitute [their] judgment for [Hannah's] doctor's." J.A. 504. Nonetheless, Hannah signed the memo to EAP and attended an appointment with an EAP counselor the next day, April 10, 2015.

On Monday, April 13, 2015, Hannah met again with one of her supervisors to discuss her leave request. Her supervisor told her that her leave request was approved but "was pushing" her to take only two weeks off, not the four she had requested. J.A. 524, 528. He explained that Hannah would have to submit to a medical evaluation if she wished to take leave beyond the two weeks. J.A. 524. Hannah felt uncomfortable with

43

her supervisor's pushiness and confused about the status of her leave request so she responded that her request was "on hold." *Id.* She wanted to figure out what the EAP counselor had told her supervisor and to confirm her legal options. *Id.*

Hannah continued to arrive at work later than 10:00 a.m. during April 2015. During that month, Hannah also continued attending the EAP sessions. In those sessions, Hannah testified, she was questioned about her medical history, her family's medical history, and the medication she was taking and its dosage. J.A. 531–32. In the third session, Hannah was given a diagnostic questionnaire "to assess depression or severity of those sorts of things." J.A. 534.

On April 16, 2015, the EAP counselor had an extended forty-minute discussion with Hannah's second-line supervisor. During that discussion, the counselor disclosed that Hannah's "lack of motivation/inability to come to work" was primarily influenced by feelings of frustration over not securing a permanent position at ODNI. J.A. 604. At some point, the counselor also indicated that Hannah was not cooperating with the EAP process because she was spending "more than half the session at times" expressing concerns over the record retention policy. J.A. 192.

A week later, Hannah's second-line supervisor circulated a status update via email to ODNI leadership outlining the information shared by the EAP counselor. That information included Hannah's explained reasons for her inability to arrive punctually for work, as well as Hannah's concerns that the EAP process would "create a paper trail that [would] adversely impact her future employment and career." J.A. 606. The email also

indicated that the EAP counselor had identified "non-medical" factors as the primary cause of Hannah's attendance problems. J.A. 607.

On April 28, 2015, Hannah met with one of her supervisors and reiterated her request for four weeks of leave. J.A. 41. She was told that her leave request would be approved if she met with the EAP counselor once more on May 1, 2015 and signed a Letter of Expectations. J.A. 42. Hannah attended the May 1 appointment and signed the Letter of Expectations on May 4, 2015. J.A. 43. The Letter of Expectations provided that, "[e]ffective immediately," Hannah would begin work by 10:00 a.m. and would contact her office no later than 9:30 a.m. in the event she would be late. J.A. 614.

Beginning on May 5, 2015, Hannah took a four-week leave of absence. She returned to work on June 1, 2015 and was immediately tasked with leading a significant study. J.A. 44–45. Her attendance problem "largely disappeared as Hannah responded to the need for daily meetings all over the community." J.A. 612.

On June 9, 2015, Hannah interviewed for a permanent position with ODNI—Program Mission Manager Cyber ("Cyber"), a job she had applied for at the end of April or beginning of May 2015. J.A. 620–21. She was unanimously selected by the interview panel as the most qualified candidate for the position. J.A. 206, 625. A week later, the interview panel forwarded its recommendation to ODNI's Chief Management Officer, Mark Ewing. J.A. 206–07. Ewing was already aware of the decision to refer Hannah to the EAP and had been consulted in that decision-making process. J.A. 216. As Ewing testified, the EAP referral was intended not only to address Hannah's issues with the

45

temporary job she had at the time; Ewing's "concern was her conduct in relationship to being selected for a permanent government position." J.A. 217, 585.

Hannah's application for the Cyber position stalled for several weeks, despite the fact that the approval process typically only took a few days. J.A. 443, 630. On June 25, 2015, members of the interview panel began questioning the holdup. J.A. 633. In response, Ewing sent an email to the Principal Deputy Director of National Intelligence ("PDDNI") recommending that Hannah not be approved for the Cyber position based on her recent attendance history. J.A. 635–36. Ewing also represented that the EAP counselor had concluded that Hannah did not have a medical problem, "rather she is a disciplinary problem." J.A. 635.

The PDDNI shared that email with the Director of National Intelligence ("DNI"). Neither the PDDNI nor the DNI approved Hannah for the permanent position. J.A. 722. On July 7, 2015, Hannah was notified that she was not selected for the position. J.A. 638. Hannah completed her temporary term at ODNI on March 27, 2016 as a high performer, yet did not secure a permanent position with the department.

## II.

## A.

I first take issue with the Court's treatment of Hannah's discrimination claim under the Rehabilitation Act. The majority concludes that Hannah's 13 "attendance issues" between March 19, 2015 and May 4, 2015 constituted a "significant attendance and reporting problem." Maj. Op. at 27–28. Accordingly, the majority credits this

46

proffered legitimate, non-discriminatory reason for ODNI's failure to hire Hannah for the permanent Cyber position.[2] The majority also concludes that Hannah has failed to satisfy her burden at this stage of presenting sufficient evidence that ODNI's explanation for rejecting her application is pretext for disability discrimination. Maj. Op. 24–26.

I disagree with the majority's conclusions for several reasons. Fundamentally, ODNI's proffered reason for not hiring Hannah reflects a misunderstanding of Hannah's disability. Among the most typical symptoms of depression are a loss of interest in nearly all activities, decreased energy, disturbed or irregular sleep, and an impaired ability to function in one's daily activities, including communicating with others. Jerry Von Talge, Ph. D., *Major Depressive Disorder—Essential Features*, 26 Am. Jurisprudence Proof of Facts 1, § 12 (3d ed. 1994); *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 853 (8th Cir. 2002) ("A jury could consider the difficulty one suffering from depression has with communications . . . ."). "Even the smallest tasks seem to require substantial effort." VonTalge, *Major Depressive Disorder—Essential Features*, 26 Am. Jurisprudence Proof of Facts 1, § 12. In Hannah's case, although she was taking medication to treat her depression, she was "unable to just get going." J.A. 413. She was "lethargic or almost unconcerned." *Id.* Her demeanor was "sad, very flat, and almost trance like." *Id.* Yet, Hannah came to work, and her job performance remained "excellent." J.A. 408.

---

[2] ODNI does not dispute that Hannah's depression qualifies as a disability under the Rehabilitation Act.

In light of the nature of Hannah's disability and the record evidence, I am baffled by the majority's conclusion that her conduct amounted to a "significant attendance and reporting problem" as a matter of law. Maj. Op. at 28; *see Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) ("Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (internal citations and quotation marks omitted)). Hannah's behavior is far from the "blatant and persistent misconduct" that we have found to be lawful grounds for adverse employment actions in this context. *Vannoy*, 827 F.3d at 305. In *Vannoy*, for example, the employee, like Hannah, suffered from depression. *Id.* at 299. We found that Vannoy's employer had a legitimate, non-discriminatory reason to terminate his employment, despite his disability, when Vannoy had several unscheduled absences from work; drove an employer vehicle for a three-day, out-of-state work assignment and stayed at a hotel paid for by his employer, yet did not once report for duty; refused to complete his portion of a performance improvement plan; and left work without authorization. *Id.* at 299–300, 305. It was in that context that we explained that the Americans with Disabilities Act ("ADA") "does not require an employer to simply ignore an employee's *blatant and persistent misconduct*, even where that behavior is potentially tied to a medical condition." *Id.* at 305 (emphasis added); *see also* 29 U.S.C. § 791(f) (incorporating ADA employment standards into section 501 of the Rehabilitation Act).

Unlike in *Vannoy*, the record here does not paint a picture of Hannah as an insubordinate employee who refused to cooperate with her employer and blatantly

48

misused department resources. To the contrary, Hannah openly communicated with her supervisors, even if she did so later in the day than they had expected. She informed her supervisors of her depression and cooperated by attending the sessions with the EAP counselor. During the 46-day period between the first accommodation and Hannah's written agreement to begin work at a specified time, she had four unscheduled absences and came into work after 10:00 a.m. nine times. J.A. 556. On all but two occasions she communicated her anticipated schedule to ODNI. And on one of those two occasions, Hannah arrived by 11:00 a.m., the time after which her supervisors were to contact her. *Id.* During this time she actively worked with her medical professionals to design an alternative solution, and she requested, on more than one occasion, that ODNI grant the recommended leave of absence. In fact, Hannah was absent only once and arrived after 10:00 a.m. only twice before her initial leave request was denied. *See id.* Had her supervisors granted her leave of absence on April 9 when she first requested it, many of her attendance issues would have been avoided. A jury could reasonably conclude that Hannah's late arrivals to work continued only because her depression was not effectively accommodated. *See* J.A. 175 (both medical professionals recommended four-week leave); J.A. 612 (noting Hannah's attendance problem "largely disappeared" upon her return from leave). On this record, I find unfounded the characterization of Hannah's conduct as blatant and persistent as a matter of law.

Furthermore, Hannah has sufficiently shown that ODNI's proffered reason for not hiring her—her attendance problems—may be pretext for disability discrimination. At the summary judgment stage, Hannah need not conclusively prove discrimination. But

49

she must proffer sufficient evidence from which a reasonable jury could conclude that she was in fact the victim of intentional discrimination by ODNI. *Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 419 (4th Cir. 2015). I would find that she has met this burden for two reasons.

First, as Hannah argues, questions of fact exist as to whether her attendance was a serious problem, or whether her attendance even violated any work-hours policy. The record suggests that it was not until May 4, 2015 that Hannah was given a formal time by which to arrive at work. *See, e.g.*, J.A. 108 ("[D]ifferent people had different schedules . . . ."); *id.* (explaining that while most employees arrived at work around 9:00 a.m., there was no "explicit" requirement to do so); J.A. 518 (denying that a "core hours expectation" existed before September or October 2015). Although her supervisors told her on March 19, 2015 that she was to report by 10:00 a.m., they also initially agreed to contact her if she did not report by 11:00 a.m. Had the 10:00 a.m. start time been deemed a requirement, it would make little sense to have made any further arrangements. When one of her supervisors attempted to unilaterally change that arrangement, he acceded to Hannah's request for time to propose an alternative. Hannah requested the doctor-recommended leave of absence as an alternative, but she was never told that she was required to work specific hours; she remained formally on a maxi flex schedule. It was not until the Letter of Expectation on May 4, 2015 that a formal start time was imposed. The department itself did not move to "core" hours until October 2015. J.A. 518. Therefore, Hannah's work schedule during the relevant time may have been "erratic,"

50

Maj. Op. 26, but a reasonable jury could conclude that it did not violate any established work-hours requirement.[3]

Second, I would find that Mark Ewing's inconsistent statements regarding his knowledge of Hannah's disability, coupled with the above evidence, are sufficient evidence of pretext to survive summary judgment. The majority emphasizes that Ewing did not have first-hand knowledge of her condition and that he was informed that her depression was under control. Maj. Op. 25. But depression is not like physical illnesses; it does not simply dissipate overnight. Its symptoms may be under control one day yet triggered the very next. *See* Sidney H. Kennedy, M.D., *A Review of Antidepressant Therapy in Primary Care: Current Practices and Future Directions*, Primary Care Companion for CNS Disorders, vol. 15(2), PCC.12r01420 (Apr. 11, 2013) (noting that major depressive disorder, the disease with which Hannah was diagnosed, is "chronic and episodic" in nature). Indeed, Hannah was able to control her symptoms for years while working at ODNI. Ewing was consulted by Hannah's supervisors in connection with their decision to refer Hannah to EAP. J.A. 216. The EAP memo, a copy of which Ewing possessed, explicitly stated: "[Hannah] informed us that she was meeting with a psychiatrist and counselor and taking medication for depression." J.A. 413. And the

---

[3] Hannah's supervisors testified that, because she arrived later than other employees, they were forced to reassign work that would have fallen to her. There is evidence that the work assignments were made around 9:00 or 9:30 a.m. J.A. 108–09. Had Hannah's supervisors truly been concerned about being able to assign her work, one would expect the accommodation they offered to Hannah to have required her to come into the office by 9:00. No such requirement was ever made of her.

51

memo implicitly made the connection between Hannah's "struggling to get out of bed in the morning" and recent upheavals in her life that "negatively impacted some of her physical coping mechanisms." *Id.* In fact, it noted that Hannah "appear[ed] to gain more energy and become aware as the day progress[ed] into early evening." *Id.* On this evidence, a reasonable jury could determine that Ewing was aware that Hannah's depression affected her ability to get to work by 10:00 a.m. and required medical intervention and that Ewing's initial statement that he was unaware of her condition was intended to cover up the true reason for his desire not to hire her: her disability.

In sum, because a reasonable jury could conclude on this record that Hannah's attendance issues were far from "blatant and persistent misconduct," *Vannoy*, 827 F.3d at 305, and that ODNI's proffered reason for failing to hire Hannah for the Cyber position was pretext for discrimination on the basis of her disability, I would reverse the district court's grant of summary judgment on the discrimination claim.

B.

I also take issue with the Court's conclusion that no question exists as to the reasonableness of the accommodations made by ODNI. The reasonableness of an accommodation depends "on a good-faith effort to assess the employee's needs and to respond to them." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir. 1996). Importantly, "a 'reasonable accommodation' is one that '*effectively* accommodates the disabled employee's limitations.'" *Bellino v. Peters*, 530 F.3d 543, 549 (7th Cir. 2008) (emphasis added) (citation omitted). In identifying a reasonable accommodation, employers are required to engage in an interactive process with the disabled employee.

52

*See* 29 C.F.R. § 1630.2(o)(3); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015) ("The ADA imposes upon employers a good-faith duty 'to engage [with their employees] in an interactive process to identify a reasonable accommodation.'" (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346 (4th Cir. 2013))); *Bellino*, 530 F.3d at 548–50 (discussing ADA's interactive-process requirement in the context of claim brought under section 501 of the Rehabilitation Act). It is only if an employer provides a reasonable accommodation that the employer's failure to engage in an interactive process will not sustain a failure-to-accommodate claim. *Jacobs*, 780 F.3d at 581.

The majority finds that ODNI provided Hannah with two accommodations: (1) the March 19, 2015 agreement that Hannah would report for work by 10:00 a.m., and (2) the referral to EAP. Maj. Op. 12. I submit that questions of fact exist with respect to whether ODNI made a good-faith effort to respond to Hannah's needs and whether either of these accommodations was effective, *i.e.*, whether the accommodations were reasonable. And because a question of fact exists as to that issue, I agree with Hannah that a question also exists as to whether her employer engaged in the required interactive process.

Hannah argues that her supervisors' initial commitment to contact her if she did not contact them or arrive by 11:00 a.m. was the *sine qua non* of the first accommodation. But Hannah's supervisors allowed that accommodation to remain in place for only four working days before unilaterally modifying it and, according to Hannah, angrily pressuring her to propose an alternative accommodation on the spot.

53

When Hannah did propose an alternative—four weeks of leave, as recommended by both of her treating medical professionals—her supervisors denied the request because they had already decided that EAP counseling was more appropriate. Speculating that they knew better than both of Hannah's medical professionals, her supervisors believed that her medical providers lacked "the expertise to provide" an opinion on "all of the items" they wanted to submit to the EAP. J.A. 95. And while Hannah's supervisors had suggested that she take leave a few months earlier, prior to any signs that Hannah's disability would affect her ability to get into work in the morning, J.A. 173, they threatened to terminate her employment if she did not first attend EAP sessions after she requested medically recommended leave to cope with her depression, J.A. 176. On this evidence, the question of whether the first accommodation and the decision to require EAP counseling before granting medically recommended leave were made in good faith and were effective to address Hannah's disability should be submitted to the jury, as reasonable minds could conclude that they were not.

Likewise, the reasonableness of ODNI's delay in granting Hannah leave should be decided by a jury. Concededly, the short duration of the delay (from April 9, 2015 to May 4, 2015) undercuts Hannah's argument of unreasonableness. *See Terrell v. USAir*, 132 F.3d 621, 628 (11th Cir. 1998) (finding that delay of three months in providing accommodation was reasonable). However, Hannah's attendance—and the manifestation of her depression—was negatively impacted during the delay period; ODNI purposefully

delayed her leave while she attended required EAP sessions[4]; ODNI would have terminated Hannah's temporary position if she failed to attend the EAP counseling[5]; and Mark Ewing intended to use the EAP sessions to gather information regarding Hannah's suitability for future employment.[6] Presented with this evidence, a reasonable jury could conclude that the delay was the result of ODNI's bad faith. *Feliberty*, 98 F.3d at 280. Thus, I would reverse the grant of summary judgment on Hannah's reasonable accommodation claim.

## C.

I would also reverse summary judgment on Hannah's claim that she was subjected to an unlawful medical examination as a current employee.

Under the Rehabilitation Act, "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); 29 U.S.C. § 791(f).

---

[4] *See* J.A. 422 ("The recommendation of the group was if Hannah were to ask for leave, we should defer that decision until after meeting with EAP."); J.A. 176 ("EAP was concerned that since I was a single woman if I took leave I would be home by myself and that could make my depression worse.").

[5] *See* J.A. 176 (Hannah's statement that she was told she had "no choice" but to attend the EAP sessions or her job would be terminated immediately).

[6] *See* J.A. 584–85 (Mark Ewing's deposition testimony that EAP referral "wasn't initially just about" Hannah's temporary position but also because Ewing "knew she was looking for permanent employment").

First, a clear dispute exists as to whether the EAP sessions constituted a required medical examination under the Rehabilitation Act. Despite the voluntary nature of EAP counseling highlighted by the majority, Maj. Op. 15, two of Hannah's supervisors testified that the sessions were in fact "mandatory." J.A. 448, 474. As Hannah explained, she was told by her supervisor that she had "no choice" in the matter and that if she did not participate in the EAP counseling, her temporary position with ODNI would be declared "as excess" and she "would be out of a job immediately." J.A. 176.

The majority emphasizes the EAP counselor's testimony that she did not conduct a medical examination. Yet, the Court's opinion says nothing about Hannah's testimony regarding the substance of her sessions with the counselor. According to Hannah, she was asked for a family medical history, questioned about her medication and dosage, and even administered a diagnostic tool used to assess depression. J.A. 531–32, 534.

In light of this testimony, a reasonable jury could conclude that the EAP sessions were in fact required and that the diagnostic tool constituted a "procedure or test that seeks information about an individual's physical or mental impairments or health." E.E.O.C., *Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* (EEOC Notice 915.002) (July 27, 2000). Likewise, a jury could determine that the questions asked during the sessions amounted to a "series of questions . . . likely to elicit information about a disability" and the scope of Hannah's disability. *Id.*; *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 677 (1st Cir. 1995). As Hannah's supervisors explained, the decision to refer her to EAP was to determine whether her attendance was

due to "a medical mental health problem." J.A. 422. Their decision was predicated on a concern that granting Hannah the doctor-recommended leave could "make [her] depression worse" and could even "be dangerous." J.A. 176, 422–23. After meeting with Hannah, the EAP counselor even suggested that Hannah could have bipolar disorder. J.A. 601–02. If faced with this evidence, a reasonable jury could easily find that the EAP sessions were in fact required medical examinations or disability-related inquiries.

With respect to the second prong of our inquiry—whether the EAP sessions were job-related and consistent with business necessity—questions of fact also preclude summary judgment. "[W]hether a mental examination was 'job-related and consistent with business necessity' is an objective inquiry." *Pence v. Tenneco Auto. Operating Co., Inc.*, 169 F. App'x 808, 812 (4th Cir. 2006) (citing *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001)). It is the employer who bears the burden of proving this prong. *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014). "A business necessity must be based on more than 'mere expediency,' and will be found to exist where the employer can 'identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties.'" *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 173 (4th Cir. 2014) (citing *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97–98 (2d Cir. 2003); *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)). A business necessity may also exist if a medical examination is necessary to determine "whether an employee's absence or request for an absence is due to legitimate

57

medical reasons, when the employer has reason to suspect abuse of an attendance policy." *Thomas*, 483 F.3d at 527 (citing *Conroy*, 333 F.3d at 98).

I would find that ODNI is not entitled to summary judgment because a reasonable jury could conclude that the employer lacked a "reasonable belief based on objective evidence that [Hannah] was unable to perform the essential functions of her job or that she posed a threat to herself or to others based on a medical condition." *Wright v. Ill. Dep't of Children and Family Servs.*, 798 F.3d 513, 524 (7th Cir. 2015); *see also Kroll*, 763 F.3d at 623 ("[T]he individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." (citing *Pence*, 69 F. App'x at 812) (other citation omitted)). It is undisputed that Hannah's supervisors, as well as Mark Ewing, were involved in the decision to refer Hannah to the EAP. Therefore, the question is whether those supervisors had objective evidence that Hannah was unable to perform an essential function of her job. For the period including Hannah's "egregious" attendance issues, she received an overall performance rating of 4.53 out of 5.00—a rating of "Excellent." J.A. 406–10. Yet the majority concludes that her poor attendance precluded her from performing an essential function of her job.

I submit that this conclusion cannot be reached as a matter of law on this record, a record that seriously calls into question ODNI's sincerity in its assertion that Hannah was unable to perform an essential function of her job. For the entirety of Hannah's time as the disclosures coordinator on the Snowden project, she started work and left work later than other ODNI employees. J.A. 25, 494. Although she came in later, she got the job

done, and she did it "impeccabl[y]." J.A. 412. She was able to manage her depression and worked long hours in a stressful environment while excelling. J.A. 19–20, 412. Her supervisors had no qualm with her attendance, and aside from the maxi flex schedule, there was no formal work-hours requirement in place. J.A. 492–94, 518. When that project winded down in late 2014 and early 2015, Hannah's supervisors did not institute "core" hours or otherwise formally remove Hannah from the maxi flex schedule. J.A. 461, 518. In light of Hannah's ODNI-sanctioned history of beginning her work day later than others (a practice which simply continued into April 2015), the apparent lack of any formal policy requiring that her schedule be otherwise, and her consistent "excellent" performance reviews, there is at the very least a question of fact regarding ODNI's "reasonable belief based on objective evidence that [Hannah] was unable to perform the essential functions of her job." *Wright*, 798 F.3d at 524.

This is not to say that the essential functions of Hannah's job did not include regular attendance. *See Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994). However, as discussed above, a jury could reasonably conclude that ODNI had no "reason to suspect abuse of an attendance policy," *Thomas*, 483 F.3d at 527 (citation omitted), when no such policy formally existed and when Hannah had been allowed for over a year to begin work later than other department employees. And although Hannah requested leave, her supervisors had decided before Hannah's request that they would defer a decision on any leave request until after the EAP referral because they expected a "quick answer" from EAP. J.A. 95. But "mere expediency" is insufficient to establish business necessity. *Coursey*, 577 F. App'x at 173.

59

In light of these considerations, I would submit the issue of whether the EAP sessions were job-related and consistent with business necessity to the jury for resolution.

D.

Finally, I would reverse the district court's grant of summary judgment on Hannah's FMLA retaliation claim. ODNI argues that Hannah cannot prove this claim because her non-selection for the Cyber position was due to "her significant attendance and reporting problems prior to her first leave request." Resp. Br. 48. For largely the same reasons that I would reverse with respect to Hannah's discrimination-in-hiring claim, I would find that there is sufficient evidence in the record to create a material issue of fact for the jury to decide on this claim.

Hannah suffered from a disability, one that could effectively be accommodated with leave. Unfortunately, her leave was granted only after she struggled to manage her disability—a struggle which a reasonable jury could readily conclude did not violate any attendance policy. Despite Hannah's rebound upon her return, ODNI used her late arrivals during the time for which she requested but was denied leave as grounds for denying her a permanent position, a position for which it is undisputed that she was exceptionally qualified. J.A. 623–25, 635–36. In essence, ODNI assigned Hannah to a high-stress position after which her depression worsened; delayed her request for FMLA-qualifying leave to accommodate her depression, thereby intensifying her symptoms; then refused to hire her for a permanent role when she returned from leave. Because of this, and for the reasons I articulate above, a jury could reasonably conclude that ODNI's rejection of Hannah's application for permanent employment was based on the exercise

60

of her FMLA rights in requesting and taking a qualifying leave of absence to accommodate her disability.